# LEXIS CASES

LEXSEE

**SIMILIANO MARTINEZ, BONIFACIO SANTIAGO, DONATO SANTIAGO, JAVIER SANTIAGO, MARGARITO CRUZ and MIGUEL GONZALEZ, and on behalf of others similarity situated, Plaintiffs, -against- E&C PAINTING, INC., GIANT TAPING AND PLASTERING, INC., ISIDRO VELASQUEZ, EMIGDIO VELASQUEZ, and RUFIANO VELASQUEZ, Defendants.**

**06 Civ. 05321 (RJH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2008 U.S. Dist. LEXIS 12832**

**February 21, 2008, Decided**
**February 21, 2008, Filed**

**PRIOR HISTORY:** Martinez v. E & C Painting, Inc., 2007 U.S. Dist. LEXIS 33481 (S.D.N.Y., May 2, 2007).

**COUNSEL:** [*1] For Similiano Martinez, Bonifacio Santiago, Donato Santiago, individually and on behalf of all others similarly situated, Javier Santiago individually and on behalf of all others similarly situated, Margarito Cruz, individually and on behalf of all others similarly situated, Miguel Gonzalez, individually and on behalf of all others similarly situated, Plaintiffs: Adam T Klein, Justin Mitchell Swartz, Linda Anne Neilan, Mark Robert Humowiecki, LEAD ATTORNEYS, Outten & Golden, LLP (NYC), New York, NY.

For Jose Diaz, Juan Santiago, Plaintiffs: Linda Anne Neilan, Outten & Golden, LLP (NYC), New York, NY.

For E&C Painting, Inc., Isidro Velasquez, Emigidio Velasquez, Defendants: Martin H. Scher, LEAD ATTORNEY, Robert S. Nayberg, The Scher Law Firm, LLP, Carle Place, NY.

For Giant Taping and Plastering, Inc., Rufino Velasquez, Defendants: Mark C. Sternick, LEAD ATTORNEY, Mark C. Sternick, Esq, Forest Hills, NY.

**JUDGES:** Richard J. Holwell, United States District Judge.

**OPINION BY:** Richard J. Holwell

**OPINION**

**ORDER**

On January 16, 2008, Magistrate Judge Dolinger issued a Report and Recommendation ("the Report") in this case recommending that defendants' motions to dismiss [40, 55] the claims of plaintiffs Margarito Cruz and Miguel [*2] Gonzalez be granted in part and denied in part. No objections have been filed. In the absence of objections, the Court reviews the Report for clear error, *See Edwards v. Fischer,* 414 F. Supp. 2d 342, 346-47 (S.D.N.Y. 2006). Finding none, the Court adopts the Report and dismisses the claims of plaintiffs Margarito Cruz and Miguel Gonzalez without prejudice and without an award of costs against plaintiffs' counsel.

SO ORDERED.

Dated: New York, New York

February 21, 2008

/s/ Richard J. Holwell

Richard J. Holwell

United States District Judge

LEXSEE

**FESTUS BANJO, Plaintiff, -v- UNITED STATES OF AMERICA, Defendant.**

**95 CIV. 633 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1996 U.S. Dist. LEXIS 10743**

**July 29, 1996, Decided
July 30, 1996, FILED**

**DISPOSITION:** [*1] Government's motion for costs and attorney's fees beyond this amount denied.

**COUNSEL:** APPEARANCES:

For Plaintiff: Festus Banjo, pro se, Brooklyn, NY.

For Defendant: Wendy H. Schwartz, Assistant U.S. Attorney, Southern District of New York, New York, NY.

**JUDGES:** Denise Cote, United States District Judge

**OPINION BY:** Denise Cote

**OPINION**

*OPINION & ORDER*

DENISE COTE, District Judge:

On January 30, 1995, plaintiff Festus Banjo ("Banjo") brought this action against the United States of America ("the Government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2761 *et seq.,* seeking damages for injuries sustained when a postal truck collided on April 6, 1994, in Manhattan with a car owned and operated by Banjo. At the conclusion of discovery, the Government moved to dismiss the Complaint and for monetary sanctions pursuant to Rule 37(b), Fed. R. Civ. P., and this Court's inherent powers for plaintiff's refusal to engage in discovery and for his false deposition testimony regarding material facts.

**BACKGROUND**

Banjo's Complaint alleges that he was severely and permanently injured by the April 6 accident and that his car was damaged. The issues in this action include [*2] whether Banjo suffered a "serious" injury within the meaning of the New York Insurance Law, N.Y. Ins. Law § 5104 (McKinney 1985) ("No Fault law"), which prohibits recovery for noneconomic loss except in the case of a "serious" injury; the extent of any property damage to plaintiff's car; and the extent to which the accident has prevented Banjo from earning a living.

Banjo, who was represented by counsel at the time the action was filed and throughout discovery, stipulated to a discovery plan that the Court approved on May 8, 1995. Under the plan, discovery was to be completed by September 19, 1995. On May 19, 1995, the Government served interrogatories and document requests and noticed the plaintiff's deposition for June 30, 1995. Plaintiff did not respond to the Government's requests until July 24, 1995, at which time he produced copies of certain medical records, [1] tax returns for 1991 through 1994, two body-shop repair estimates for repairs to the car, the police report of the accident, and one medical bill from Hamilton Medical Services. Plaintiff's interrogatory responses, which were neither signed nor sworn to, identified a Community Hospital in California as an additional [*3] medical facility with relevant records. Banjo did not, however, provide any authorization to obtain records from that facility or any of its records.

1   Medical records reveal that the plaintiff was diagnosed with "neck strain" at Lenox Hill Hospital immediately following the accident and released. Four days later he was seen at Maimonides Medical Center, where he complained of a headache but no abnormality was noted. Records from Hamilton Medical Services, where plaintiff was treated from April 12, 1994 through November 15, 1994, reflect a compression fracture of the cervical spine, cervical radiculopathy, early carpal tunnel symptoms in the left hand, right elbow triceps tendinitis, lumbosacral radiculopathy and lumbosacral derangement.

Plaintiff's deposition was held on September 12, 1995. At the deposition the Government learned that Banjo had additional documents responsive to Government document requests that had not been produced. Banjo also identified for the first time two neurologists from whom he [*4] had received treatment following the accident and a hospital where he had received care prior to the accident. The Government requested authorizations for access to these medical records and reiterated its request for an authorization to obtain the California medical records. The deposition also revealed that the dollar amounts of damages alleged by Banjo in his interrogatory answers were incorrect. The Government requested that revised, sworn responses to the interrogatories be provided.

On October 5, 1995, the Government forwarded the original deposition transcript of Banjo's deposition to his attorney for Banjo's review and signature. The transcript has never been returned. On January 5, 1996, plaintiff's counsel represented to the Court that he had sent Banjo the original deposition for his review. In response to this motion, Banjo indicates that he did not receive a copy of his deposition until February 6, 1996, but has not returned it because it has innumerable mistakes and is incomplete. He contends, therefore, that the deposition should be disregarded by the Court.

Banjo's attorney requested an extension of the discovery deadline on September 11, 1995. Through a September [*5] 19, 1995, letter, the Government notified Banjo of all of his outstanding discovery obligations. On September 20, 1995, the Court extended discovery to November 22, 1995. On September 28, 1995, the Court signed an Amended Scheduling Order that set out a more detailed schedule for production of outstanding items. Banjo was ordered to produce the outstanding documents identified in the Government's September 19, 1995, letter by October 29, 1995, with certain exceptions noted in the Order.

On October 16 and 17, 1995, Banjo produced additional authorizations for medical records, including one for the California records. Banjo did not produce and as of today has not produced revised and sworn interrogatory answers regarding various damage issues; additional medical bills; documents regarding damage to the car; or the photographs he took of the car.

On July 24, 1995, Banjo had identified Dr. Licciardi and two of his associates, all of whom are from Hamilton Medical Services, as his experts. Banjo never produced expert reports, however, as required by Rule 26(a)(2), Fed. R. Civ. P., and as specifically scheduled in the Orders of September 28, 1995, and November 27, 1995. When it became [*6] clear that Banjo would not be providing expert reports for Dr. Licciardi and his associates

and thereby would be waiving his right to call them as experts, the Government sought to take the deposition of Dr. Licciardi as a treating physician. When Dr. Licciardi learned that the Government would not compensate him for his deposition testimony, Dr. Licciardi refused to appear. The report produced by the Government's expert indicates that Banjo sustained no injury from the accident aside from a possible cervical and lumbar strain or sprain.

The Government contends that documents it has obtained from third parties reveal that Banjo gave false testimony at his deposition about the following three areas. At his deposition Banjo testified that in the ten years prior to the accident he had not suffered any serious injuries requiring medical attention; that he had not gone to a hospital for anything other than a swelling of the wrist; and that the April 6, 1994, accident was the first accident of his life. The California medical records show, however, that Banjo was involved in a car accident in 1985 in which he may have sustained injuries to his cervical spine. In his opposition to this motion, [*7] Banjo contends that the 1985 accident was a motorcycle accident that resulted in nothing more that a cut to his left hand, which was bandaged up, and that he was released from the hospital in less than two hours. He does not contend that the Government's description of his deposition testimony is inaccurate.

Banjo testified repeatedly in his deposition that he has been unable to drive since the accident. Records from the Department of Motor Vehicles reveal that Banjo received citations for moving violations on September 1, 1994, and September 10, 1994. Records from the Taxi and Limousine Commission show that Banjo received a citation at LaGuardia Airport on July 2, 1994, for operating a limousine for hire without a license to do so. Each of these incidents occurred after the April 6, 1994, accident and before the September 12, 1995, deposition. In his opposition to the motion, Banjo does not address the September citations, but contends that he was only a passenger in the car at the time the July 2 citation was issued at LaGuardia airport. [2]

2  The citation indicates that Banjo was observed operating the vehicle.

[*8]  Finally, at his deposition Banjo testified that the accident damaged his car's transmission, that it got progressively worse, and that after May 1994 he was unable to drive it. The July 2, 1994, citation at LaGuardia airport, however, was for the 1984 Lincoln Town Car limousine that Banjo was driving at the time of the accident. In his opposition to the motion, Banjo contends that a friend of his fixed the transmission of the car sufficiently on July 1 for the vehicle to make it to the airport.

The only other defense that Banjo has offered to the Government's accusation that he gave false deposition testimony is the complaint that an attorney other than the one he had retained appeared to represent him at the deposition. He also asserts that he was weary, had not adequately prepared for the deposition, and that it was the first time he had ever been deposed.

At a conference held with the Court on December 1, 1995, the government described the deficiencies relating to discovery, and plaintiff's counsel indicated his desire to be relieved as counsel for the plaintiff. The Court ordered plaintiff's counsel to submit a written application supported by an affidavit in connection with [*9] his request to withdraw, and the Government was ordered to outline its complaints regarding discovery in a letter. The Court adjourned the conference to December 15, 1995, with the explicit understanding that plaintiff's counsel would arrange for Banjo to attend the conference.

On December 7, 1995, and in response to the December 1 Order, the Government notified the Court and plaintiff's counsel in writing of its desire to make a motion pursuant to Rule 37 and the Court's inherent powers for an order dismissing Banjo's Complaint for his failure to participate in discovery and for his false deposition testimony. The Government's letter gave a detailed description of the failures and the false testimony.

Banjo did not attend the December 15, 1995, conference despite being notified by his attorney that he should attend. Banjo's attorney renewed his request to withdraw from the action on the grounds that, among other things, Banjo refused to assist his attorney in his attempts to comply with the Government's discovery demands. Banjo's attorney noted that he would have no substantive response to the issues raised in the Government's December 7 letter and that he believed there was a "severe [*10] possibility" that the plaintiff would not even make the no fault threshold since he wouldn't be able to show that he had sustained a "serious" injury. According to plaintiff's counsel, Banjo had not seen Dr. Licciardi, his treating physician, for a year. The attorney indicated that he had told Banjo that the case should be voluntarily withdrawn so that Banjo could avoid the imposition of costs and sanctions. The Court directed Banjo's attorney to serve Banjo personally with his affidavit seeking to withdraw, the Government's December 7, 1995 letter, and an Order to Show Cause requiring Banjo to appear in person at a conference on January 5, 1996. The Order to Show Cause, which the Court issued on December 20, indicated that the plaintiff was required to show cause why the case should not be dismissed for failure to participate in discovery.

On January 5, 1996, Banjo, his attorney and the Government attended a conference with the Court. The Court granted the attorney's request to withdraw, a request to which Banjo consented; confirmed that Banjo had been served with the Government's December 5 letter; and allowed Banjo additional time to obtain another attorney. The Court also set [*11] a briefing schedule for the Government's motion and advised Banjo of three alternatives with which he was faced. One alternative was to voluntarily dismiss the case before January 19. If he did so, the Government would not file the motion and would not ask the Court to impose costs on Banjo in connection with the motion. Another option was to obtain the services of a new attorney by January 19. If that lawyer asked for a conference with the Court, I indicated I would suspend the motion schedule until I had an opportunity to hear from the attorney. A third option was that Banjo would decide to pursue the case and respond to the Government's motion. In the case of the latter option, he ran the risk that I would grant the Government's request to impose sanctions, including a monetary fine against him, when I decided the motion. Banjo indicated that he understood his options.

In response to the Government's motion, plaintiff asserts that "he had no Attorney . . . to adequately represent him," and that his attorney "collaborated with the Government" and "was bought and purchased by the Government." With respect to the latter accusation, plaintiff apparently means that his attorney was [*12] paid by the Government to deter him from suing the Postal Service driver and instead to sue the Government; according to plaintiff, his attorney subsequently told him that "he could not take the Government to court and prevail." Finally, the plaintiff reiterates his various injuries and his belief that he is entitled to be paid for such injuries, and he requests leave of Court to sue the driver of the Postal Service truck that allegedly injured plaintiff. [3]

> 3  Plaintiff's argument rests on the erroneous assumption that he could have stated a claim under the FTCA against the driver. So long as the driver was acting within the scope of his employment, the tort remedy under the FTCA against the Government is exclusive. *See* 28 U.S.C. § 2679(b)(1). For the same reason, plaintiff's application for leave to sue the driver is denied.

## LAW

*Dismissal Under Rule 37(b)(2)*

Rule 37(b)(2), Fed. R. Civ. P., provides, in relevant part:

> If a party . . . fails to obey an order to provide or permit discovery, [*13] . . . the court in which the action is pending

may make such orders in regard to the failure as are just, and among others the following:

. . .

An order . . . dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

So long as the Court has "clearly articulated [an] order . . . requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with the order." *Turner v. Hudson Transit Lines, Inc.,* 1992 U.S. Dist. LEXIS 2827, 1992 WL 51570, at *4 (S.D.N.Y. Mar. 9, 1992) (citing *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1363 (2d Cir. 1991) (citations omitted)). Because dismissal is a "harsh remedy" and should be used "only in extreme situations," it may be entertained only where the party has demonstrated "'willfulness, bad faith, or any fault'" in the course of discovery. *See Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir. 1990) (citing *Theilmann v. Rutland Hosp., Inc.,* 455 F.2d 853, 855 (2d Cir. 1972); quoting *Salahuddin v. Harris,* 782 F.2d 1127, 1132 (citation omitted)). In addition, this sanction will be imposed only after the party [*14]  has been warned of the risk of dismissal for failure to comply with Court orders. *See Bobal,* 916 F.2d at 765. Dismissal is appropriate, however, "where the plaintiff has demonstrated an unwillingness to fulfill the discovery obligations imposed by the Federal Rules of Civil Procedure." *Moore v. Kaye Ins. Assocs.,* 1995 WL 600244, at *3 (S.D.N.Y. Aug. 8, 1995) (Cote, J.).

Although Rule 41(b), Fed. R. Civ. P., governs dismissals based on plaintiff's failure to prosecute, it is appropriate to be guided by those factors which courts consider before dismissing a case under Rule 41(b) prior to dismissing the case under Rule 37 *See Moore,* 1995 WL 600244, at *4. These factors are (1) the duration of plaintiff's failures; (2) whether plaintiff has received notice of the potential sanctions; (3) the prejudice to the defendant arising from plaintiff's actions; (4) due process considerations balanced against the Court's interest in managing its docket; and (5) the efficacy of lesser sanctions. *See Lucas v. Miles,* 84 F.3d 532, 1996 WL 273749, at *2 (2d Cir. May 16, 1996); *Jackson v. City of New York,* 22 F.3d 71, 74 (2d Cir. 1994).

*Fees Under Rule 37(c)*

In addition, Rule 37(c) endows [*15]  this Court with discretion to assess sanctions for failure to disclose

or for disclosure of false or misleading information as required by the Federal Rules of Civil Procedure. Thus,

A party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions . . . [such as] payment of reasonable expenses, including attorney's fees, caused by the failure, [as well as sanctions pursuant to Rule 37(b)(2)(A), (B), and (C)].

Rule 26(a)(5) provides parties with various discovery methods, including depositions, written interrogatories, production of documents, and requests to admit. *See* Rule 26(a)(5), Fed. R. Civ. P.

*Inherent Powers*

A court has inherent power "to supervise and control its own proceedings and to sanction counsel or a litigant for bad faith conduct." *Sussman v. Bank of Israel,* 56 F.3d 450, 459 (2d Cir. 1995) [*16]  (citing *Chambers v. Nasco, Inc.,* 501 U.S. 32, 43-50, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1990)). *See also U.S. v. Int'l Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2d Cir. 1991), *cert. denied,* U.S. . Such power allows the Court discretion in choosing an appropriate sanction, ranging from counsel fees (whether imposed on counsel or his or her client) to outright dismissal for failure to prosecute. *See Chambers,* 501 U.S. at 43-45; *Teamsters,* 948 F.2d at 1345.

Nevertheless, bad faith conduct that can be adequately sanctioned under the Federal Rules does not usually warrant resort to the court's inherent power. *Chambers,* 501 U.S. at 50. Furthermore, sanctions pursuant to the court's inherent power are inappropriate unless the challenged conduct is: "(1) entirely without color and (2) motivated by improper purposes such as harassment or delay." *Milltex Indus. Corp. v. Jacquard Lace Co. LTD.,* 55 F.3d 34, 38 (2d Cir. 1995) (internal quotation marks and citation omitted). Like other sanctions, the Court must be mindful of the litigant's or counsel's due process rights, and "due process concerns posed by an outright dismissal are plainly greater [*17]  than those presented by assessing counsel fees against lawyers." *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767 & n.14, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980). Finally, a court's

factual findings of bad faith must entail "a high degree specificity." *Id.* (internal quotation marks omitted).

## DISCUSSION

The Government's discovery demands reasonably sought to obtain information about plaintiff's prior accidents, medical treatment, post-accident injuries, and work activities to evaluate plaintiff's claim that the accident caused him a serious injury as required by New York's No Fault law. The Government's discovery demands concerning the state of plaintiff's limousine after the accident were also eminently reasonable since they directly relate to the extent of plaintiff's property damage and economic loss allegedly caused by the accident.

### Willfulness and Duration of Plaintiff's Failures

Plaintiff, through his counsel, originally agreed to complete discovery by September 19, 1995. This deadline was subsequently extended to November 22, 1995. Plaintiff has been on notice of specific discovery requests since the Government's September 19, 1995 letter; this Court's [*18] September 28, 1995 Order clearly required plaintiff to respond to the Government's discovery demands as set forth in said letter (with certain exceptions) no later than October 20, 1995. Plaintiff has failed to produce, for example, the photographs plaintiff took of his limousine, documents relating to the alleged property damage, and various medical bills. In addition, the September 28 Order required plaintiff to provide answers to the Government's interrogatories by November 22, 1995; to date, no sworn interrogatory answers have been provided to the Government. The September 28 Order also required plaintiff to satisfy the Government's Rule 26 discovery demands regarding plaintiff's proposed experts no later than October 27, 1995. The Court's November 27, 1995 Order extended this deadline to December 5, 1995, but to date, no expert reports have been produced by the plaintiff. The duration of plaintiff's delay in conducting basic discovery, therefore, has been extensive and in willful disregard of Court orders.

### Notice and Due Process Considerations

Plaintiff has been on notice of the instant motion since early December 1995. This Court gave plaintiff several opportunities to [*19] respond to the threat of sanctions set forth in the Government's December 7 letter. Plaintiff was given an opportunity to appear before this Court on December 15, 1995, but he failed to appear. The December 20 Order to Show Cause expressly warned plaintiff of the threat of dismissal. Most importantly, when plaintiff did appear before this Court in response to the December 20 Order on January 5, 1996, this Court gave plaintiff one final opportunity to withdraw his case or otherwise face the threat of sanctions.

Plaintiff, therefore, has had ample notice of the instant motion and ample opportunity to respond to said motion; due process requires no more.

### Prejudice to the Defendant

Plaintiff's discovery failures have precluded the Government from learning the extent of plaintiff's alleged bodily injuries and property or economic damages; without question, discovery into these matters is essential in a personal injury case such as this one, and plaintiff's failure to produce such relevant facts "substantially impairs an adversary's ability to answer the plaintiff's allegations and to defend oneself at trial." *Moore,* 1995 WL 600244, at *4.

### Efficacy of Lesser Sanctions

Discovery [*20] has long been over. Given the paucity of information which the Government has gathered regarding plaintiff's alleged injuries both bodily and economic, and the complete failure to produce Dr. Licciardi's expert report, there is no lesser sanction short of dismissal that is appropriate under these circumstances. Simply put, plaintiff cannot show that his alleged noneconomic injuries are "serious" as required by New York's No Fault law. Requiring the Government to bear the expense of a trial in such circumstances would be both unnecessary and costly. Furthermore, with respect to the Government's charges that plaintiff lied at his deposition, I find that plaintiff's response to said charges is inadequate and strongly indicative of his unwillingness to conduct discovery honestly and responsibly. Additionally, plaintiff's failure to sign and return his deposition, with or without corrections, is further evidence of plaintiff's willful failure to participate in discovery. Such willful obstruction of discovery has in the past warranted dismissal pursuant to Rule 37 "not only as punishment for [such] conduct, but also as a deterrent to others." *See Nittolo v. Brand,* 96 F.R.D. 672, 676 [*21] (S.D.N.Y. 1983).

### Monetary Sanction

For the same reasons, plaintiff's inadequate explanations for the inconsistencies which the Government discovered regarding plaintiff's deposition clearly demonstrate that plaintiff has acted in bad faith and with the improper motive to frustrate discovery by the Government.

## CONCLUSION

Dismissal pursuant to Rule 37(b)(2), Fed. R. Civ. P., is therefore warranted. The Clerk of Court is hereby ordered to dismiss the Complaint with prejudice. I further find that a monetary sanction pursuant to Rule 37(c),

1996 U.S. Dist. LEXIS 10743, *

Fed. R. Civ. P., due to plaintiff's failure to produce documents and sworn interrogatory answers is appropriate under the circumstances. This monetary sanction is also made pursuant to this Court's inherent powers for plaintiff's false deposition testimony. The plaintiff is ordered to pay $ 200.00 in attorney's fees and costs to the defendant within 60 days after entry of this Order. The Government's motion for costs and attorney's fees be-

yond this amount is denied in light of plaintiff's limited economic circumstances.

SO ORDERED:

Dated: New York, New [*22]  York

July 29, 1996

Denise Cote

United States District Judge

LEXSEE

**RAFAEL RIVERA, Plaintiff, -against- WARDEN OF M.C.C., N.Y.; DR. GLOVER, HEAD OF THE MED. DEPT. AT M.C.C., N.Y.; HEAD OF THE REC. DEPT. AT M.C.C., N.Y.; B.O.P., Defendants.**

**95 Civ. 3779 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2000 U.S. Dist. LEXIS 8212**

**June 13, 2000, Decided**
**June 13, 2000, Filed**

**DISPOSITION:**    [*1]  All claims dismiss against all defendants in this case other than United States.

**COUNSEL:** RAFAEL RIVERA, plaintiff, Pro se, White Deers, PA.

For WARDEN OF M.C.C., N.Y., DR. GLOVER, HEAD OF THE REC. DEPT. AT M.C.C., N.Y., B.O.P., THE DESIGNERS OF THE BUILDING LOCATED AT 150 PARK ROW, N.Y., N.Y. 10007 ID. AS M.C.C., N.Y., defendants: Sarah Thomas, U.S. Attorney's Office, Southern District of NY, New York, NY.

**JUDGES:** CHARLES S. HAIGHT, JR., SENIOR UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

*MEMORANDUM OPINION AND ORDER*

*HAIGHT, District Judge:*

    In this Court's opinion dated February 1, 2000, familiarity with which is assumed, the Court converted the common law tort claims alleged in the *pro se* complaint into claims arising exclusively under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, ("FTCA"), and substituted the United States as the only proper defendant thereunder. *See Rivera v. Warden of M.C.C.*, 2000 U.S. Dist. LEXIS 8801, 2000 WL 124809, *2. In addition, the Court noted that it would liberally construe the complaint to state an Eighth Amendment deliberate indifference claim against defendant Dr. Glover, the Clinical Director of the Health Services Unit

at the Metropolitan Correction Center in Manhattan (the "MCC"), in his personal capacity under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971). In order to maintain a *Bivens* action against an individual defendant, however, the [*2]  defendant must be personally served in accordance with Fed. R. Civ. P. 4(e). *Armstrong v. Sears*, 33 F.3d 182, 186 (2d Cir. 1994). The Second Circuit has explained that service under Rule 4(i)(2), which suffices for suit against a defendant sued in his official capacity, is not a proper means of service for a *Bivens* claim against an individual. *Id.* at 186-87 ("In a *Bivens* case, personal service should be made upon the individual defendant in accordance with Rule 4(e) instead of upon that individual as a government officer in accordance with Rule 4(i)(2), which incorporates by reference the requirement of service upon the United States in accordance with Rule 4(i)(1)."). Because it was not clear from the record, the Court directed the parties to furnish their positions as to whether Dr. Glover was personally served, and if not, whether good cause has been shown to allow personal service upon him at this juncture. The parties have now submitted their respective positions. Having reviewed their submissions, I am satisfied that personal service was not effected on Dr. Glover pursuant to Rule 4(e).

    Insofar as relevant here, Rule 4(e) allows service [*3]  to be made on an individual "(1) pursuant to the law of the state in which the district court is located . . . (2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein . . . ." Under both New York law and the Federal Rules, personal service may also be effected by obtaining a waiver or acknowledgment of ser-

vice from the defendant. *See* Fed. R. Civ. P. 4(d); New York Civil Practice Law and Rules ("NYCPLR") § 312-a. In addition, New York law permits personal service to be made by delivering the summons to a person of suitable age and discretion at the defendant's place of business and mailing a second copy to the defendant's last known address or to his business in an envelope bearing the legend "personal and confidential." NYCPLR § 308(2). By contrast, under Rule 4(i)(2), service may be effected on an officer of the federal government by sending a copy of the summons and complaint to him by registered or certified mail as well as sending a copy to the United States Attorney of the district [*4] and the Attorney General. These two methods of service differ chiefly in that under most circumstances, personal service requires at a minimum personal delivery either to the defendant or to a person of suitable age and discretion at the defendant's residence or workplace.

In the present case there can be no legitimate contention that any one of the permissible methods of personal service was utilized with respect to Dr. Glover. The uncontroverted evidence shows that service upon Dr. Glover met the requirements of Rule 4(i)(2), but not Rule 4(e). Because Rivera was granted *in forma pauperis* status, he was entitled to rely on the U.S. Marshals Service to effect service of process on the defendants. *See Armstrong*, 33 F.3d at 183-4. To initiate that process, Rivera completed Request for Service forms ("USM-285 Forms") for each of three defendants, Dr. Glover, Warden Reish and the Bureau of Prisons, Northeast Regional Office. *See* Government's Letter Brief dated February 16, 2000 at Ex. A. The USM-285 Form plaintiff filled out for Dr. Glover furnished an address for Dr. Glover at his place of business, and also requested service on the United States, which, as [*5] noted above, is necessary for proper service on an officer pursuant to Rule 4(i)(2). The Form contained no special instruction that Glover be served personally.

The bottom half of a USM-285 Form contains a section to be completed by a deputy Marshal after service has been effected or attempted. On Glover's completed USM-285 Form, which has been filed in this Court, this section contains a handwritten notation indicating that the summons and complaint were "served by certified mail" on June 26, 1995. The deputy marshal who completed the Form checked the box that stated, "I hereby certify and return that I have legal evidence of service," and left blank the two other choices, that the defendant was "personally served" or that service was made on "a person of suitable age and discretion then residing in the defendant's usual place of abode." A copy of a certified mail receipt addressed Dr. Glover at the MCC is attached to the Form.

In its submission, the government provides the Declaration of Dr. Glover dated February 16, 2000 ("Glover Decl."), stating that "he received a copy of the summons and complaint" in this case on June 29, 1995, but does not "now recall what kind of envelope [*6] or mail service was used to deliver the summons and complaint." Glover Decl. at P 2. In addition, the government has furnished the February 16, 2000 Declaration of Dominique Raia, a Staff Attorney for the Bureau of Prisons who has been assigned to the MCC since 1991. Ms. Raia explains that she received a copy of the summons and complaint from Dr. Glover on or about June 29, 1995. She further states that after either she or Dr. Glover reviewed the envelope in which the summons and complaint were sent, she wrote a notation "6/29/95 received -- regular mail -- no return address" on the top right corner of the summons. A copy of the summons with that notation is attached to her Declaration. Raia further explains that because it is her practice to keep copies of forms requesting waiver of service pursuant to Rule 4(d), the absence of any such form in her file in this case leads her to conclude that waiver of service was not requested of Dr. Glover.

For his part, plaintiff does not submit any evidence that contradicts the evidence furnished by the government or that otherwise demonstrates that personal service by any approved method was made on Dr. Glover. Instead, plaintiff asserts that [*7] in addition to filling out the aforementioned USM-285 Forms, he sent copies of the summons and complaint to his mother and asked her to attempt to serve defendants Glover and Reish. He does not state what method of service he asked his mother to use. Plaintiff's mother, Yvette Rosado, has furnished a Declaration dated March 2, 2000 ("Rosado Decl.") stating that after receiving copies of the summons and complaint from plaintiff in late May or early June of 1995, she was instructed by him to deliver them to the MCC. She explains that it is her belief that she "delivered those documents immediately after receiving them". Rosado Decl. P 3.

Neither plaintiff's statements nor Rosado's declaration demonstrates that personal service was made. Assuming that Rosado's recollection that she delivered them is correct, she does not identify how the documents were delivered -- whether they were placed in a mailbox, dropped through a slot at the MCC, handed to a clerk, etc. Nor does she indicate that she personally served Glover or someone of suitable age and discretion at the MCC and then mailed the summons and complaint to him in the proper fashion. The fact that Rosado never filed a return of [*8] service attesting that she served any of the defendants eliminates one possible source for filling in the blanks in her recollection.

In a further attempt to demonstrate that Glover was personally served, plaintiff has submitted what he purports to be a "Notice and Acknowledgment of Receipt of Summons and Complaint" that he says he filled out and attached to the complaint apparently in an effort to obtain a waiver of service from Dr. Glover pursuant to Rule 4(d). But the document furnished contains no indication that it was ever sent. Nor does plaintiff actually say that it was sent or state that he requested the Marshals to obtain a waiver of service from Dr. Glover. The USM-285 Form completed by the deputy marshal and the declarations of Glover and Raia all indicate that no waiver of service was ever sent to Glover and plaintiff does not conclusively state that one was.

In the Court's view, plaintiff has failed to show that Dr. Glover was served personally. The evidence in the record instead leads inexorably to the conclusion that he was served in compliance with Rule 4(i)(2), which is sufficient for an official capacity suit but not for a *Bivens* action.

Having determined [*9] that service was not effected on Dr. Glover pursuant to Rule 4(e), it follows that no *Bivens* action can lie against him unless the Court permits plaintiff to personally serve him at this late stage pursuant to Rule 4(m). Rule 4(m) provides in relevant part:

> If the plaintiff shows good cause for the failure [to serve the defendant within 120 days after filing the complaint], the court shall extend the time for service for an appropriate period.

I conclude that plaintiff has failed to establish the requisite "good cause."

"In determining whether a plaintiff has shown good cause under Rule 4(m), courts in this Circuit generally consider whether (1) the plaintiff made reasonable efforts to serve the defendant, and (2) the defendant was prejudiced by the delay in service." *Equal Empl. Opp. Comm. v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 474 (S.D.N.Y. 1999) (internal quotations omitted). Some courts have found good cause to exist in cases involving an *in forma pauperis* plaintiff when the failure or delay in service was entirely the fault of the U.S. Marshals Service which ignored the plaintiff's explicit instructions for service. For example, [*10] in *Armstrong, supra*, 33 F.3d 182, the Marshals disregarded the plaintiff's instructions on the USM-285 Form that the defendants should be served personally and attempted only once, without success, to obtain waivers of service from those defendants. The district court denied the defendants' motion to dismiss for lack of service and directed plaintiff to ensure

that the Marshals effect service. The plaintiff then followed up by sending the Marshals a copy of the court's order and twice visiting the Marshals' office to inquire about the status of service. Despite these efforts, the Marshals never attempted to effect service as directed. The Second Circuit reversed the district court's subsequent dismissal of the complaint for lack of service, indicating that the Marshals Service's dereliction of its duty to effect service in plain disregard of plaintiff's instructions should not have been held against the plaintiff. 33 F.3d at 188.

Similarly, in *Romandette v. Weetabix Company, Inc.*, 807 F.2d 309, 311 (2d Cir. 1986), the Second Circuit reversed the district court's dismissal of the *in forma pauperis* plaintiff's complaint for ineffective [*11] service. In that case, despite the plaintiff's specific request that the Marshals personally serve the defendant, such service was not effected until almost ten months after the request, well after the time limit for service had expired. The Second Circuit held that the plaintiff who "had done everything in his power to effect personal service through the Marshal's Service" could not be penalized for the Marshals' failure to serve, and the plaintiff's reliance on the Marshals constituted "good cause" under the predecessor to Rule 4(m) to excuse the untimely service. *Id.* A number of other courts have reached similar conclusions, reasoning that an *in forma pauperis* plaintiff's reliance on the Marshals to effect service on a defendant constitutes good cause for extending the time for service if the plaintiff has provided the proper instructions for service and the Marshal has failed to comply. *See generally Husowitz v. American Postal Workers Union*, 190 F.R.D. 53, 57-58 (E.D.N.Y. 1999) (collecting cases).

The case at bar is readily distinguishable. Each of the referenced cases involved a specific direction by a plaintiff that was ignored by the Marshals. In this [*12] case, by contrast, Rivera cannot legitimately blame the failure to personally serve Dr. Glover on the Marshals Service because he never instructed it to serve Dr. Glover personally. To be sure, *in forma pauperis* plaintiffs are entitled to rely on the Marshal to effect service and should not be penalized for its neglect of this duty. But "a plaintiff relying upon the U.S. Marshal for service must provide the necessary information and documents to effectuate service." *Friday v. United States Dep't of Justice*, 1994 U.S. Dist. LEXIS 1619, *3, No. 93 Civ. 283, 1994 WL 48956, *1 (D. Ore. Feb. 7, 1994).

In this case, the Marshals Service fully *complied* with plaintiff's requests for service. The Marshals timely served all three defendants for whom plaintiff submitted USM-285 Forms according to the method of service prescribed by Rule 4(i)(1) and (2). Plaintiff *did not* specifically request that personal service be made on Dr. Glover, and nothing in the USM-285 Form he filled out

for Glover suggests the necessity or desire for personal service. On the Form, Rivera provided Dr. Glover's work address and requested that the United States be served along with Dr. Glover. Requesting that service be [*13] made upon the United States strongly indicates that an officer defendant is to be served not as an individual, but pursuant to Rule 4(i)(2), which requires the United States to be served whenever an officer is sued in his official capacity. By contrast, the United States is not required to be served when an officer is sued in his personal capacity. *See Armstrong*, 33 F.3d at 187. Moreover, defendants' Answer explicitly avers that Dr. Glover and the other defendants are "sued herein in their official capacities only." Answer at p. 1. Thus, to the extent that plaintiff may have believed that the defendants were sued (and therefore served) in their personal capacities, the Answer should have put him on notice that they were not. And yet, plaintiff never sought to remedy that perceived defect.

In short, none of the evidence suggests that Rivera, like the *Armstrong* plaintiff, did "everything in his power" to have Glover served personally. To the contrary, Rivera simply did not request that the Marshals Service personally serve any of the defendants. He therefore cannot establish good cause by claiming that the Marshals Service disregarded his instructions. Instead, [*14] the lack of personal service stems from plaintiff's own failure to instruct the Marshals Service properly. This may very well have resulted from plaintiff's unfamiliarity with the principle that an officer must be personally served in order to maintain a *Bivens* action against him in his personal capacity. But despite the latitude courts afford *pro se* plaintiffs, Rivera's lack of understanding of the requirements of service does not excuse the absence of proper service.

It is a well-settled and often repeated principle that "*pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them." *Edwards v. INS*, 59 F.3d 5, 8 (2d Cir. 1995). This maxim extends to the rules governing service of process. The Second Circuit has declared that "a judge is certainly not required to treat inadvertence or ignorance of the Rules as 'good cause' or 'excusable neglect' for delay in service." *Zankel v. United States*, 921 F.2d 432, 436 (2d Cir. 1990). Indeed, courts have consistently held that "ignorance of the law, even in the context of *pro se* litigants does not constitute good cause [under Rule 4(m)]. [*15] " *Charles v. New York City Police Dep't*, 1999 U.S. Dist. LEXIS 14274, *20, No. 96 Civ. 9757, 1999 WL 717300, *6 (S.D.N.Y. Sept. 15, 1999) (*pro se* plaintiff was not excused from failing to serve defendants by her ignorance of the proper methods of service), *report and recommendation adopted by Charles v. D'Agostino*, 1999 U.S. Dist. LEXIS 15018, 1999 WL 771406

(S.D.N.Y. Sept. 29, 1999). *See also Friday*, 1994 WL 48956, *1-2 (incarcerated plaintiff's failure to request Marshals to serve U.S. Attorney resulted in dismissal of complaint against individual in official capacity; plaintiff's ignorance of requirements of service rule did not excuse that failure); *Pena v. Recore*, 1999 U.S. Dist. LEXIS 16329, No. 95 Civ. 5307, 1999 WL 966107, *2 (E.D.N.Y. Oct. 21, 1999) (*pro se* plaintiff's ignorance of the rules was not a "sufficient excuse" for failure to serve defendants); *Townsel v. County of Contra Costa, California*, 820 F.2d 319, 320 (9th Cir. 1987) ("To hold that complete ignorance of [Rule 4(m)] constitutes good cause for untimely service would allow the good cause exception to swallow the rule.").

It follows from these authorities that if Rivera was unaware that personal service pursuant [*16] to Rule 4(e) was necessary in order to maintain a *Bivens* action against Glover, that ignorance may be understandable in fact given his *pro se* status, but it is not excusable in law. Accordingly, I conclude that because Rivera did not give the Marshals Service an instruction which it disregarded, his reliance on the Marshals does not excuse his failure to personally serve Glover. This holds true even if his failure to request personal service arose from his ignorance of the personal service requirement or of the different methods of service under the rules. Because Rivera offers no other justification for the absence of personal service, no basis exists for a finding of "good cause" that would allow me to extend, by nearly five years, plaintiff's time to serve Glover personally.

Although my conclusion that plaintiff did not make any reasonable attempt to personally serve Glover is sufficient to disallow an extension under Rule 4(m), *see, e.g., Pena v. Recore*, 1999 WL 966107, *2 (plaintiff's failure to take steps to ensure service upon defendants prevented finding of good cause, prejudice to the defendants was not a consideration), it is worth noting that plaintiff [*17] has not shown that Dr. Glover would not suffer prejudice if personal service were permitted to be made at this stage. The salient events in this case occurred in late 1993 and early 1994, over six years ago. In her Declaration, Ms. Raia explains that at least two potential witnesses for Dr. Glover, individuals who probably assisted in plaintiff's treatment, have since left the employ of the Bureau of Prisons and even if they could be located may not voluntarily testify. Moreover, even if they were to testify, these and other witnesses' memories of Rivera's medical treatment may have significantly dimmed over the many years that have passed since the events occurred.

Contrary to plaintiff's suggestion, this is not a case in which late service would not cause prejudice because the defendant has long had notice of the complaint. Although there is no dispute that for five years Dr. Glover has been

2000 U.S. Dist. LEXIS 8212, *

aware of this lawsuit, he was not on notice that he would be sued in his personal capacity. A lawsuit that alleges an officer's personal liability under *Bivens* is different in numerous material respects from a FTCA claim that alleges liability against the officer's employer alone. As a preliminary [*18] matter, the legal standards are quite different. An FTCA claim against the United States involves common law negligence, whereas an Eighth Amendment claim under *Bivens* requires showing of more than mere negligence and presents the possibility of a qualified immunity defense. Thus, the evidence likely to be at issue in the two claims, while overlapping, will be different in many respects. In addition, for obvious reasons, a claim against an officer in his personal capacity may serve as a stronger motivational catalyst for that officer's mounting of a vigorous defense than a suit against the officer in his official capacity only. For the last five years, Dr. Glover did not have any reason to believe that he was on the line personally and therefore did not know that he would have to defend himself against a charge of deliberate indifference to plaintiff's medical needs with all that claim entails. To allow such a claim to go forward now would unfairly prejudice Dr. Glover.

Because plaintiff has not shown that he made reasonable efforts to personally serve Dr. Glover and that Dr. Glover would not be prejudiced if personal service were made at this time, I conclude that good cause [*19] does not exist to allow late service under Rule 4(m). Accordingly, no *Bivens* action may lie against Dr. Glover. This case will therefore go forward as an FTCA claim alone. All defendants other than the United States, the only proper defendant on an FTCA claim, are hereby dismissed.

As noted in the February 1, 2000 opinion, the parties have expressed a willingness to attempt to arrive at a disposition of this case short of trial and have requested a judicially-supervised settlement conference. The parties' request is granted. By separate order I will refer this case to a magistrate judge for the purpose of holding a settlement conference. [1]

> 1 Because the FTCA does not provide for a jury trial, I would serve as the factfinder in any trial in this case and therefore it would be inappropriate for me to guide the parties' settlement discussions.

The government's response to the plaintiff's Pre-Trial Statement which was filed in January may await the outcome of the court-supervised settlement process. The parties [*20] are directed to inform the Court as soon as they have completed that process. At that time, if no settlement has been reached, the Court will furnish a schedule for the filing of the government's Pre-Trial Statement and the plaintiff's reply thereto.

The Clerk of the Court is directed to dismiss all claims against all defendants in this case other than the United States.

It is SO ORDERED.

Dated: New York, New York

June 13, 2000

CHARLES S. HAIGHT, JR.

SENIOR UNITED STATES DISTRICT JUDGE

LEXSEE

**DRUCILLA ABAH, Plaintiff, -against- NEW YORK CITY DEPARTMENT OF TRANSPORTATION, JOSEPH PITELLI and PAT NELSON, Defendants.**

**96 Civ. 6192 (HB)(MHD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1998 U.S. Dist. LEXIS 1555**

**February 11, 1998, Decided
February 13, 1998, Filed**

**DISPOSITION:**    [*1] Plaintiff's motion for summary judgment enforcing settlement agreement denied. Defendants' motion to dismiss complaint denied.

**COUNSEL:** For DRUCILLA C. ABAH, plaintiff: Randall K. Packer, Kramer, Levin et al., New York, NY.

DRUCILLA C. ABAH, plaintiff, Pro se, New York, NY.

For NEW YORK CITY DEPARTMENT OF TRANSPORTATION, defendant: Judith C. McCarthy, Horan & Horan, White Plains, NY.

For NEW YORK CITY DEPARTMENT OF TRANSPORTATION, defendant: Steven Weiss, Paul A. Crotty, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** MICHAEL H. DOLINGER

**OPINION**

*MEMORANDUM & ORDER*

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

Plaintiff Drucilla Abah commenced this action to press claims of employment discrimination against her employer, the New York City Department of Transportation, and two individual defendants. In the wake of plaintiff's disappearance in the face of imminent sentencing on a criminal conviction, defendants have moved for an order dismissing the case for lack of prosecution and

violation of a court order. Plaintiff's counsel has in turn moved for summary judgment enforcing a settlement [*2] agreement orally arrived at by the parties just before plaintiff's disappearance. For the reasons that follow, both motions are denied, and a status conference is scheduled.

A. *The Settlement Process*

Following the consent of the parties under 28 U.S.C. § 636(c), the court issued a scheduling order on May 23, 1997 that called for the completion of fact and expert witness discovery by October 24, 1997 and the submission of a joint pre-trial order by November 24, 1997. That schedule was subsequently stayed at the parties' request in order to facilitate settlement discussions. (*See* Endorsed Order dated July 2, 1997).

After being advised during a telephone conference that the parties had reached an impasse in their negotiations, the court convened an in-person conference on August 6, 1997, with counsel and plaintiff present. In the course of this conference, we were advised that plaintiff had pled guilty to a criminal charge of grand larceny, based on alleged welfare fraud, and, by agreement with the prosecutors, was scheduled to be sentenced the next day to a prison term of one to three years.

Given the urgency of the situation, and after extended discussions at the conference [*3] under court supervision, plaintiff, through her attorney, and defendants' counsel agreed orally on the basic terms of a settlement. Subject to final approval by the City, they agreed that defendants would pay a total of $ 20,000.00 to resolve the matter. Of this amount, $ 12,500.00 was to be credited against the lien of the Human Resources Administration for misappropriated welfare payments, which approximated $ 91,000.00. The balance of $ 7,500.00 was to be placed in trust, in recognition of the

stated need of two of plaintiff's children to obtain living quarters of their own for the estimated one year that plaintiff was expected to serve in prison. The funds were therefore to be paid out over time to the landlord of the building in which the two children were about to secure an apartment.

At the conclusion of the conference it was apparently understood that the parties still needed to negotiate the scope and wording of releases. If they reached agreement, they would have to execute the necessary documents, which was presumably to be done the next day, before plaintiff was removed to prison upon sentencing. The court also agreed to be available, if necessary, for a telephone conference [*4] to resolve any last-minute disputes.

At the conference these terms were orally summarized and agreed to. They were not reduced to writing, however, or placed on the record.

By letter dated August 7, 1997, plaintiff's counsel advised the court "that the parties have agreed to settle the case." (Aug. 7, 1997 letter to the Court from Randall Packer, Esq.). His letter did not, however, describe the terms of the settlement.

B. *Subsequent Events*

On August 7, 1997 plaintiff failed to appear for her sentencing. (Declaration of Assistant Corporation Counsel Steven Weiss, executed Dec. 22, 1997, at P 5). At the time it was believed that she might have failed to appear through some inadvertence, and the sentencing was therefore adjourned for one week. (Reply Affidavit of Randall K. Packer, Esq., sworn to Jan. 22, 1998, at P 9). Plaintiff did not appear on the adjourned date either, and it thus became clear that she had become a fugitive. (Affidavit of Randall K. Packer, Esq., sworn to Dec. 31, 1997, at P 7). To this day she has remained in that status, and her counsel and the two children who were to be the ultimate beneficiaries of the settlement profess not to know of her location. [*5] (*Id.* at PP 7, 10; Packer Reply Aff. at P 1 n.1; Oct. 10, 1997 letter to the Court from Randall K. Packer, Esq.).

After some time had passed, defendants advised plaintiff's counsel and the court that they would not consummate a settlement if the plaintiff did not reappear. (*See* Sept. 3, 1997 letter to the Court from Assistant Corporation Counsel Seven Weiss). After being apprised that plaintiff remained a fugitive, the court placed this case on the suspense calendar for sixty days (Order dated Oct. 10, 1997), and later, in view of the impasse, issued an order scheduling a conference for December 10, 1997. In that order the court directed that plaintiff appear personally and warned that if she failed to appear, it would

consider dismissing the case for lack of prosecution. (*See* Order dated Oct. 24, 1997).

Plaintiff's counsel appeared at the December 10, 1997 conference, but plaintiff did not. In view of the representation by plaintiff's attorney that he still did not know his client's whereabouts and had not been contacted by her, we authorized defendant to move to dismiss and established a briefing schedule. (*See* Order dated Dec. 15, 1997). The defendants' motion and [*6] plaintiff's cross-motion followed.

*ANALYSIS*

I. *The Motion to Enforce the Settlement*

We first address plaintiff's motion to enforce the settlement agreement, since a determination of enforceability would of course moot the dismissal motion. Plaintiff's motion must be denied.

In pressing this motion, plaintiff's counsel contends that the parties reached an enforceable oral agreement on all material terms before plaintiff fled. He further asserts that to the extent that the agreement imposed any obligations on the plaintiff -- particularly the execution of a release of her claims -- she has satisfied that requirement by executing a power of attorney in favor of three individuals who are thereby authorized to sign for her. (*See* Packer Aff. at P 10 & Ex. A).

Defendants' opposition rests on three principal contentions. First, they assert that they did not intend to be bound until the execution of a written settlement agreement, which never occurred. Second, they argue that plaintiff failed to comply with what they contend is a condition precedent of the agreement -- that she surrender for sentencing and imprisonment. Alternatively, they suggest that if plaintiff intended [*7] to abscond when she negotiated the agreement, then she fraudulently induced defendants to agree to the settlement. Third, they insist that plaintiff has not complied with the explicit requirements of the settlement agreement, even as articulated by her counsel, since she failed to appear and execute the necessary release. As for the purported power of attorney, they appear to suggest that such a procedure was not contemplated by the oral agreement and, in any event, that the signature on the power-of-attorney form is suspect.

We start by noting that plaintiff's motion is styled as one for summary judgment. A motion for summary judgment may be granted only when the moving party demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See, e.g., Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997); *Lefcourt v. United States*, 125 F.3d 79, 82 (2d Cir. 1997); *Tomka v. Seiler*

*Corp.*, 66 F.3d 1295 1304, (2d Cir. 1995). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 [*8]  U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In making this assessment, the court is required to draw all factual inferences in favor of the nonmovant. *See, e.g., EFCO Corp. v.. U.W. Marx, Inc.*, 124 F.3d 394, 397 (2d Cir. 1997); *Vona v. County of Niagara, New York*, 119 F.3d 201, 206 (2d Cir. 1997).

We start by considering whether the parties in this case agreed to be bound by an oral understanding. In making this determination, we need not decide whether federal law controls. As the Second Circuit has recently noted, the standards embodied in New York law are essentially the same as those applicable under federal law. *See Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320 (2d Cir. 1997).

The governing criteria require that

> we . . . consider (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Id.* at 323 (citing *Winston v. Mediafare* [*9]  *Entertainment Corp.*, 777 F.2d 78, 80-81 (2d Cir. 1986)). Based on these considerations, we conclude that the parties did not enter into a binding agreement.

The question of whether there has been an "express reservation" of the right not to be bound by an oral understanding is a bit muddied in this case, because we lack a written preliminary agreement. *Compare* 131 F.3d at 324. What we do have, however, is a proposed settlement agreement that defendants conveyed to plaintiff's counsel in July 1997, just prior to the impasse that led to the August 6 conference with the court. (*See* Declaration of Assistant Corporation Counsel Steven Weiss, executed Jan. 15, 1998, at PP 3-4 & Ex. A). That draft includes a merger provision, which limited the scope of the agreement to the terms of the written contract and expressly disavowed any separate or additional oral understanding. (*See id.*, Ex. A at P 6). At the very least, the inclusion of this provision suggests that it was the intention of the defendants not to be bound by any oral agreement. *See, e.g., Ciaramella*, 131 F.3d at 324 (noting that merger clause in draft indicated intention not to be bound except by written agreement); [*10]  *R.G. Group,*

*Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 76 (2d Cir. 1984); *McCoy v. New York City Police Dep't*, 1996 U.S. Dist. LEXIS 11561, 1996 WL 457312, at *2 (S.D.N.Y. Aug. 14, 1996).

In opposing this analysis, plaintiff's counsel points out that this proposed agreement was never accepted by plaintiff. While unquestionably true, this observation misses the point that the draft is at least probative of the intention of the defendants to insist on a written agreement as a precondition for a binding contract. Moreover, although plaintiff did not accept this draft, her counsel does not suggest that the disagreement concerned the merger clause, rather than other terms being demanded by the City. [1]

> 1  Indeed, at the settlement conference plaintiff's counsel made clear that the impasse concerned the size of the monetary package being offered to the plaintiff and its application to the lien held by the Human Resources Administration.

The second consideration also cuts against enforcement of the oral agreement. There has been no partial [*11]  performance by any party. Indeed, the first steps called for by the agreement involved the execution of the settlement documents, including the release by plaintiff, and she failed to appear and thus failed as well to carry out this step.

As for the third factor -- the existence of open terms -- we cannot definitively decide that question because the parties (or, more accurately, their counsel) are in dispute as to the relevant events. The provision at issue concerns the extent of any release that defendants might provide to plaintiff as part of the settlement. According to defendants' attorney, as late as August 6, 1997 he advised his counterpart that defendants would not release their counterclaims against plaintiff, and he asserts that that issue was never resolved. (Jan. 15, 1998 Weiss Decl. at P 12). In contrast, plaintiff's counsel reports that he and an attorney for defendants did reach some sort of agreement as to a limited release by defendants. (Packer Reply Aff. at P 10). Given this clear conflict, we find that if the issue had to be resolved in order to determine whether the oral agreement is binding, we would be compelled to deny summary judgment to plaintiff because [*12]  of the existence of this issue of fact.

The remaining consideration is "whether the agreement at issue is the type of contract that is usually put in writing." *Ciaramella*, 131 F.3d at 326. As the Second Circuit has noted on several occasions, "settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." *Id.* at 326 (citing *inter alia* N.Y. C.P.L.R. § 2104). *Accord, Winston*, 777 F.2d at 83.

This case is no exception. Although the terms to be embodied in the settlement were not particularly complex, there were several financial terms pertaining to the dispositions of various portions of the settlement fund. Specifically, there was an undoubted need to clarify the nature of the trust to be established for monies to be used for the rent payable on behalf of plaintiff's children. Moreover, the parties had to define with some specificity the application of the balance of the fund to the lien of the HRA. In addition, as counsel for both sides recount, the parties were not agreeing to a standard general release, and thus even if they decided that defendants would offer some form of release (*see* Packer Reply Aff. [*13] at P 10), it would have been a more limited one, with its scope undoubtedly subject to a written provision. The very fact that the parties are in disagreement as to whether they had a meeting of the minds on the release question underscores its evident complexity and the need for a writing.

In sum, given the nature of the agreement that counsel were negotiating, we infer that it was of a type that the parties would normally expect to reduce to writing before agreeing to be bound. Thus, this factor also undermines plaintiff's contention that the defendants had agreed to be bound by an oral agreement.

Our review of the foregoing considerations leads us to conclude that defendants in fact did not bind themselves by an oral settlement agreement with plaintiff. The course of the negotiations -- including the proffer of a form of settlement agreement with a merger clause -- strongly suggests that defendants did not intend to be bound absent a written agreement. Moreover, there was no performance of the purported agreement by either side, and the nature of the arrangements in question strongly suggests that defendants were assuming that it would be reduced to writing before they bound themselves [*14] to it. Finally, the remaining consideration -- whether there were open terms -- cannot weigh in favor of plaintiff since there is a dispute as to whether the parties in fact ever reached agreement on the release question.

Our conclusion on this point alone compels denial of plaintiff's motion. In addition, however, we note that even if the parties had reached a binding agreement, plaintiff could not obtain its enforcement since she has not demonstrated that she has complied with its terms. As noted, she was required to sign the release, and she has not done so. Plaintiff's counsel does not suggest otherwise, and although he proffers a power of attorney that he assumes was signed by plaintiff, the agreement, even as he describes it, makes no provision for another person to sign the release on plaintiff's behalf. Moreover, this is not a mere technicality. Plaintiff's counsel is not in a position to represent that the signature on the power-of-attorney form is that of plaintiff. All that he can report is that one of plaintiff's children handed him the form at the time of the December 10, 1997 conference. (*See* Packer Aff. at PP 10, 12; Packer Reply Aff. at P 1 n.1). There is no reason [*15] why the City should be compelled to take the risk that the signature -- which appears noticeably different from that found on plaintiff's *pro se* complaint -- is in fact not genuine, in which case they would face at least the possibility that plaintiff might ultimately repudiate it.

In short, we see no basis for granting plaintiff's motion to enforce the settlement. Given our analysis, we need not reach the question of whether plaintiff's failure to appear for sentencing breached a condition precedent of the agreement or whether she fraudulently induced defendants to agree to the settlement. We also need not address the question of whether her current fugitive status should deprive her of the right to seek affirmative relief from the court in this matter. *See generally Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280-82 (2d Cir. 1997).

## II. *The Motion to Dismiss the Complaint*

Defendants seek dismissal based on plaintiff's flight, which they suggest is demonstrative of a failure to prosecute. Alternatively, they seek the same relief based upon plaintiff's non-appearance at the December 10, 1997 conference, in violation of the court's order of October 24, [*16] 1997.

We have frequently been reminded by our circuit court that dismissal or default "is a harsh remedy, not to be utilized without a careful weighing of its appropriateness." *Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996). In assessing the issue, we are required to consider a host of factors that bear on the seriousness of the defendant's default and the availability of alternative measures to remedy the situation. As summarized by the appellate court, these considerations include:

> "[1] the duration of the [party]'s failures, [2] whether [the party] has received notice that further delays would result in dismissal, [3] whether the [movant] is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard, and [5] whether the judge has adequately assessed the efficacy of lesser sanctions."

*Id.* at 40 (quoting, *inter alia, Alvarez v. Simmons Mkt. Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir. 1988)). A review of the relevant factors in this case suggests that, despite [*17] our skepticism about plaintiff's current intentions, we should give her one last opportunity to signal an intention to proceed with this litigation.

The period of plaintiff's delay commenced with her flight from justice on August 7, 1997 and has continued for six months. This is a reasonably substantial period of time, and, more importantly, we suspect that the status quo in this respect may well be permanent, since plaintiff's failure to communicate directly with her attorney and her non-appearance at the December 10 conference seem obviously related to her desire to remain in hiding from law-enforcement authorities.

Plaintiff's counsel suggests that plaintiff's non-appearance at the December 10 conference could be attributable to her lack of notice of the conference. He further argues that, because plaintiff never became aware of the court's warning as to the consequences of such a non-appearance, dismissal at this time would unfair. (*See* Packer Reply Aff. at P 1 n.1). The premise for both arguments is that counsel could not communicate the October 24 order or its contents to his client because he does not know of her location.

This analysis is a bit too facile. First, a litigant [*18] has an obligation to keep her counsel and the court aware of her whereabouts, and a failure to do so may itself suffice to justify dismissal, since a plaintiff's disappearance can stymie the ability of the court to manage the litigation. *See generally Maduakolam v. Columbia University,* 866 F.2d 53, 56 (2d Cir. 1989); *Barahman v. Sullivan,* 1992 WL 226293, at *1 (E.D.N.Y. May 15, 1992). Second, plaintiff's counsel asserts that he was able to communicate indirectly with his client for the purpose of having her revise her original power of attorney and return it to him in time for the December 10, 1997 conference. (*See* Packer Aff. at P 10, 12). If this is correct, we are at a loss to understand why counsel could not communicate in the same manner this court's order that plaintiff personally appear at a scheduled conference and the warning that plaintiff risked dismissal if she failed to appear.

Notwithstanding these concerns, we take counsel at his word that he in fact did not communicate the contents of the October 24 order to his client. Given that failing, we are somewhat reluctant to order a dismissal at this stage without affording plaintiff one further opportunity to [*19] demonstrate that she is interested in pursuing this case even if it exposes her to the risk of arrest. [2] That inclination is reinforced by the fact that at the time of the December 10 conference, it is at least conceivable that plaintiff believed that the settlement agreement was en-

forceable, and thus that her active appearance in this case would no longer be necessary. Given our refusal to enforce the agreement, she can no longer indulge that assumption.

> 2   Given counsel's claimed ability to communicate indirectly with his client, scheduling one more conference would not necessarily be an exercise in futility.

Our review of the other relevant considerations does not dissuade us from this course. With regard to possible prejudice to defendants by virtue of further delay, their counsel has not addressed the matter explicitly in his motion. Nonetheless, since a failure to grant dispositive relief at some point in the near future would likely leave the case pending for an indefinite time into the future -- or at [*20] least until plaintiff changed her mind or the court lost patience -- we may infer the likelihood of some prejudice. *See, e.g., Peart v. City of New York,* 992 F.2d 458, 462 (2d Cir. 1993)("prejudice resulting from unreasonable delay may be presumed as a matter of law.")(quoting *Lyell Theatre Corp. v. Loews Corp.,* 682 F.2d 37, 43 (2d Cir. 1982)). That said, we believe that the scheduling of one more conference to permit plaintiff to appear in the next few weeks would not pose any meaningful prejudice to defendants.

As for calendar congestion, this concern is more pressing now than when the Second Circuit first recognized this consideration as relevant to the dismissal analysis. *See, e.g.,* Deborah Pines, *Civil Backlog Declared 'Distressing' By Newman,* N.Y.L.J., June 17, 1996, at 1, 5; Deborah Pines, *Disposition Rates in Federal Courts Slower,* N.Y.L.J., June 9, 1995, at 1, 3. *See also* Admin. Office of Fed. Courts, *Report of the Director: Judicial Business of the United States Courts 1996* Table C-10 at 186 (median time from filing to trial in S.D.N.Y. is 24 months). Moreover, in its enactment in 1990 of the Civil Justice Reform Act, 28 U.S.C. §§ 471-82, the [*21] Congress made plain that promptitude in the completion of pretrial proceedings in civil cases is to be given priority. *See* 28 U.S.C. § 471 (requiring district courts to prepare "civil justice expense and delay reduction plans" in part to "ensure just, speedy, and inexpensive resolutions of civil disputes"). When a party in effect abandons her case, she directly challenges the accomplishment of that goal. That said, we still believe that scheduling one more conference in this case will have no appreciable impact on the caseload of this court. Of course, if plaintiff disdains this opportunity or fails to permit her counsel to communicate in any way with her, we will be prepared to terminate the case promptly, thus ensuring that the lawsuit will not linger on the docket of this court if it cannot be processed further. [3]

1998 U.S. Dist. LEXIS 1555, *

3   In such a case, the extreme nature of plaintiff's failings in this respect would indicate that her due-process right to be heard on the underlying claims is entitled to little weight in our analysis. *See, e.g., Lukensow v. Harley Cars of New York*, 124 F.R.D. 64, 67 (S.D.N.Y. 1989).

[*22] *CONCLUSION*

For the reasons stated, plaintiff's motion for summary judgment enforcing the settlement agreement is denied. Defendants' motion to dismiss the complaint is also denied. The court will conduct a conference with the parties on February 25, 1998 at 11:00 A.M. in Courtroom 17D. Plaintiff is directed to appear at that conference, and her attorney is directed to use whatever means are available to him to advise his client of this requirement. If plaintiff fails to appear without adequate justification, she should expect that the complaint will be dismissed forthwith.

Dated: New York, New York

February 11, 1998

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE

LEXSEE

**XU X. DONG, Plaintiff, -against- UNITED STATES OF AMERICA, Defendant.**

**02 Civ. 7751 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 3125**

**March 1, 2004, Decided**
**March 2, 2004, Filed**

**DISPOSITION:**    [*1] Government's motion to dismiss granted. Case dismissed with prejudice.

**COUNSEL:** Xu X. Dong, Plaintiff, Pro se, New York, New York.

For Defendant: John P. Cronan, Assistant United States Attorney, New York, New York.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION**

*OPINION AND ORDER*

   **SHIRA A. SCHEINDLIN, U.S.D.J.:**

   Xu X. Dong is suing the United States of America because Anthony J. Lawrence, a federal employee, damaged his car in an accident. The government moves to dismiss because Dong failed to exhaust his administrative remedies prior to filing suit and, alternatively, because Dong has failed to prosecute his claims. For the reasons that follow, the motion is granted and the case is dismissed.

**I. BACKGROUND**

   On October 15, 2003, Dong sued Lawrence for $ 2,600 in Civil Court of the City of New York, Small Claims Part, asserting an "action to recover monies arising out of damages to auto caused by negligence of the deft." Notice of Claim and Summons to Appear, Ex. A to 1/26/04 Declaration of John P. Cronan ("Cronan Decl."). It appears that he did not file an administrative claim prior to filing his small claims suit or at any time thereafter. *See* Declaration of

Scott A. Whitted, Associate Legal Advisor for the Department of Homeland Security ("Whitted Decl."), Ex. E to Cronan Decl. In any event, on December 4, 2003, the Government removed this case to federal court and substituted the United States of America as defendant, pursuant to the Federal Tort Claims Act. *See* 28 U.S.C. § 2679(d); *see also* Certification of David Kelley, United States Attorney for the Southern District of New York, Ex. B to Cronan Decl. (certifying that Lawrence was acting within the scope of his employment at the time of the incident that gave rise to Dong's claim); Notice of Removal and Substitution, Ex. C to Cronan Decl.; Notification of Removal, Ex. D to Cronan Decl. Dong has not been heard from since a Civil Court hearing that same day.

   The day before it removed the case, on December 3, 2003, the Government sent Dong a copy of the Notification of Removal and Notice of Removal and Substitution by Federal Express to the address listed on Dong's Civil [*3] Court complaint. [1] FedEx returned the documents as undeliverable because Dong was not listed at that address and no one there would sign for his package. *See* Ex. F to Cronan Decl. The same package, sent via certified mail, was also returned. *See* Ex. G to Cronan Decl.

      1   Dong also confirmed that address as correct at the December 4, 2003, Civil Court hearing. *See* Cronan Decl. P 3.

   On December 9, 2003, the Government attempted to send Dong a copy of a letter requesting an extension of its deadline to answer or move against the complaint. The letter was sent by both FedEx and certified mail. Both were returned as undeliverable. *See* Ex. I to Cronan Decl. (FedEx); Ex. J to Cronan Decl. (certified mail receipt). On December 10, 2003, the government attempted to send its premotion letter to Dong, again by FedEx and certified mail. Not surprisingly, they too were

returned. *See* Ex. L to Cronan Decl. (FedEx); Ex. M to Cronan Decl. (certified mail receipt).

The Government even sent a letter to another [*4] person named Xu X. Dong in an attempt to apprise the plaintiff of the status of his case. *See* Ex. N to Cronan Decl. But that Xu X. Dong denied being this Xu X. Dong. *See* Cronan Decl. P 19. The Government now moves to dismiss.

## II. LEGAL STANDARD

### A. Subject Matter Jurisdiction

"It is well ingrained in the law that subject-matter jurisdiction can be called into question either by challenging the sufficiency of the allegation or by challenging the accuracy of the jurisdictional facts alleged." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 68, 98 L. Ed. 2d 306, 108 S. Ct. 376 (1987) (Scalia, J., concurring in part and concurring in the judgment) (citations omitted). *See also Robinson v. Government of Malaysia,* 269 F.3d 133, 140 (2d Cir. 2001) ("the defendant may challenge either the legal or the factual sufficiency of the plaintiff's assertion of jurisdiction, or both."). Where a defendant objects to a plaintiff's jurisdictional *pleading,* the standard of review is the same as the familiar Rule 12(b)(6) requirement: "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor [*5] of plaintiff." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000). "But where evidence relevant to the jurisdictional question is before the court, 'the district court ... may refer to [that] evidence'" without converting the motion into one for summary judgment. *Robinson,* 269 F.3d at 140 (alterations in original) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000)). Thus, "in resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure,* 290 F.3d 493, 496-97 (2d Cir. 2002).

### B. Failure to Prosecute

Dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for failure to prosecute is subject to the sound discretion of the district courts. *See Nita v. Connecticut Dep't of Environmental Protection,* 16 F.3d 482, 485 (2d Cir. 1994); *Alvarez v. Simmons Mkt. Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir. 1988). That discretion, [*6] however, should be exercised sparingly and only when the district judge is "sure of the impotence of lesser sanctions." *Chira v. Lockheed Aircraft Corp.,* 634 F.2d 664, 665 (2d Cir. 1980).

## III. DISCUSSION

### A. Subject Matter Jurisdiction

The Government is immune from suit except "as it consents to be sued." *United States v. Mitchell,* 445 U.S. 535, 538, 63 L. Ed. 2d 607, 100 S. Ct. 1349 (1980) (quoting *United States v. Sherwood,* 312 U.S. 584, 586, 85 L. Ed. 1058, 61 S. Ct. 767 (1941)). Where consent had not been given -- or where a plaintiff fails to meet the requirements established by the Government as predicates to its consent -- courts have no jurisdiction to hear suits against the Government. *See FDIC v. Meyer,* 510 U.S. 471, 475, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994) ("Sovereign immunity is jurisdictional in nature."). Under the Federal Tort Claims Act, the Government requires that before a plaintiff may initiate litigation, he "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a).

In this case, the relevant agency [*7] (the Department of Homeland Security) has certified that, since 1986, Dong has not filed an administrative complaint. *See* Whitted Decl. Indeed, there is no indication that Dong ever *alleged* that he filed such a claim. Accordingly, Dong failed to pursue, let alone exhaust, his administrative remedies and this Court has no jurisdiction to entertain his suit. *See McNeil v. United States,* 508 U.S. 106, 113, 124 L. Ed. 2d 21, 113 S. Ct. 1980 (1993) ("The FTCA bars claimants from brining suits in federal court until they have exhausted their administrative remedies. Because petitioner has failed to heed that clear statutory command, the District Court properly dismissed his suit.").

### B. Failure to Prosecute

Dismissal is appropriate for a second reason, as well. From the time this case was removed to federal court through the present, Dong has taken absolutely no action to pursue his claims. The Second Circuit has recognized five relevant factors in determining whether to dismiss a suit for failure to prosecute:

> [1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the [*8] defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard, and [5] whether the district judge has adequately assessed the efficacy of lesser sanctions.

*Shannon v. General Elec. Co.,* 186 F.3d 186, 193-94 (2d Cir. 1999) (quotation marks omitted).

Here, Dong has had no contact with either the Court or the Government since a Civil Court hearing on December 4, 2004, a period of over two months. By serving this motion, the Government has notified Dong that his failure to prosecute might result in dismissal. In addition, the Government has already made numerous attempts to serve Dong with various papers in this case. Each package has been returned to sender. Indeed, the very fact that Dong has been inaccessible for the last two months -- without notifying the Court, the Government, or the Pro Se Office of a change of address -- strongly suggests that he is not diligently pursuing this claim. *See Hibbert v. Apfel,* 2000 U.S. Dist. LEXIS 9791, No. 99 Civ. 4246, 2000 WL 977683, at *2 (S.D. [*9] N.Y. July 17, 2000) (Scheindlin, J.). Dong's totally unexplained disappearance is manifestly unreasonable, *see* 2000 U.S. Dist. LEXIS 9791, [WL] at *3, and therefore presumptively prejudices the Government. *See Peart v. New York,* 992

F.2d 458, 462 (2d Cir. 1993) (holding that prejudice may be presumed where delay is unreasonable).

Moreover, no remedy other than dismissal makes sense. Ordinarily, I might send Dong a warning or order him to appear for a hearing, but I have no way to reach him. There is no reason for this case to languish on the Court's docket or to hang over the head of the Government if Dong is unwilling or unable to prosecute it. For this reason, too, the case must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the government's motion is granted and the case is dismissed with prejudice. The Clerk is directed to close this motion [# 3] and this case.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: March 1, 2004

LEXSEE

**RUDY ORTIZ, a/k/a, FRANCISCO I. PEGUERO, Plaintiff, -against- UNITED STATES OF AMERICA, Defendant.**

**01 Civ. 4665 (AKH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2002 U.S. Dist. LEXIS 12621**

**July 9, 2002, Decided**
**July 11, 2002, Filed**

**DISPOSITION:** [*1] Complaint dismissed in its entirety.

**COUNSEL:** RUDY A. ORTIZ, plaintiff, Pro se, Brooklyn, NY.

**JUDGES:** ALVIN K. HELLERSTEIN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ALVIN K. HELLERSTEIN

**OPINION**

**MEMORANDUM AND ORDER DISMISSING COMPLAINT**

ALVIN K. HELLERSTEIN, UNITED STATES DISTRICT JUDGE:

I. Background

A. Facts

Plaintiff Rudy A. Ortiz, proceeding pro se and in forma pauperis, filed this action on April 27, 2001 pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA"). [1] Plaintiff alleges that fellow inmate Domingo Monegro slashed his face with a razor on March 11, 1999, while he was incarcerated at the Federal Correctional Institute in Otisville, New York ("FCI Otisville"). Plaintiff asserts a negligence claim against the United States, alleging that prison officials could have prevented the attack if (1) they had taken more precautions in separating and monitoring petitioner and Monegro, or (2) they had not allowed Monegro to possess a shaving razor. Plaintiff seeks $ 20 million in damages for

his permanent disfigurement and resulting psychological complex.

1  Plaintiff's complaint also refers to 42 U.S.C. § 1983. Section 1983 and its federal analog, Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971), require a showing that defendants acted under color of federal law to deprive plaintiff of a constitutional right. Since plaintiff's complaint does not refer to a deprivation of a constitutional or federal right, 42 U.S.C. § 1983 does not apply to this case.

[*2] B. Procedural History

On January 31, 2002, defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. By Order of February 8, 2002, I explained the consequences of such a motion to plaintiff and gave him until March 8, 2002 to submit any papers in opposition to the motion. By letter of February 13, 2002, the Government informed me that plaintiff had been released by the Bureau of Prisons ("BOP") and notified me that its moving papers had been refused by the Metropolitan Detention Center, plaintiff's address of record in the case. On February 14, 2002, this Court resent via certified mail the Government's moving papers and a copy of my Order of February 8, 2002 to the residential address plaintiff had given the BOP. The letter was returned by the postal service on March 2, 2002 marked "return to sender." A non-certified copy postmarked February 13, 2002 was also returned unopened. By letter of February 28, 2002, the Government informed me that the service copy of its motion resent to plaintiff's residential address had also been returned as unclaimed. Plaintiff has not informed defendant or this Court of his [*3] new mailing address

or made any other communication since October 5, 2001. Because it is impossible for either the Court or the defendant to contact plaintiff and because plaintiff has failed to show an interest in his case since he was released from custody, the Complaint is dismissed for failure to prosecute. In the alternative, I grant defendant's motion to dismiss for lack of subject matter jurisdiction.

## II. Discussion

### A. The Case Is Dismissed For Failure To Prosecute.

Under Federal Rule of Civil Procedure 41(b), a court may dismiss a claim "for failure of the plaintiff to prosecute or to comply with these rules or any order of the court." See Link v. Wabash R.R. Co., 370 U.S. 626, 630-31, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962). While dismissal is a harsh remedy, Lucas v. Miles, 84 F.3d 532, 535 (2d Cir. 1996), "the authority to invoke it for failure to prosecute is vital to the efficient administration of judicial affairs" and ensures that courts can "provide[] meaningful access for other prospective litigants to overcrowded courts." Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42 (2d Cir. 1982). Failure to [*4] prosecute can be evidenced either by an "action lying dormant with no significant activity" or a "pattern of dilatory tactics." Id. The operative condition in determining whether a dismissal for failure to prosecute is appropriate is whether the plaintiff has failed in his duty to process the case diligently. Messenger v. United States, 231 F.2d 328, 331 (2d Cir. 1956).

In determining whether the duration of the failure to prosecute warrants dismissal, I must determine (1) whether the failures to prosecute were those of the plaintiff; and (2) whether these failures were of a significant duration. See Spencer v. Doe, 139 F.3d 107, 113 (2d Cir. 1998). First, although the government's request for extensions caused some delay in this case, the failures to prosecute are clearly those of the plaintiff. Plaintiff has taken no action in this case since October 5, 2001. Plaintiff has not even fulfilled his minimal obligation to keep the pro se office of this Court informed of his change of address. See Hibbert v. Apfel, 2000 U.S. Dist. LEXIS 9791, No. 99 Civ. 4246, 2000 WL 977683 (S.D.N.Y. July 17, 2000). Both this Court and the defendant have made repeated attempts [*5] to contact the defendant and have been unable to do so.

Plaintiff has made no attempt to prosecute this case since effecting service of process nearly nine months ago, on October 5, 2001. Because it is impossible to proceed with this case so long as plaintiffs whereabouts are not known, I dismiss this complaint pursuant to Federal Rule of Civil Procedure 41(b) for failure to prosecute.

### B. The United States Is Immune From Suit Under The Discretionary Function Exception

Even if the plaintiff had diligently pursued this case, this Court lacks jurisdiction over plaintiff's claims. As a sovereign, the United States is immune from suit unless it enacts a statute consenting to be sued, and the terms of its consent define the court's subject matter jurisdiction to entertain the suit. United States v. Sherwood, 312 U.S. 584, 586, 85 L. Ed. 1058, 61 S. Ct. 767 (1941). Waivers of sovereign immunity are to be strictly construed, Morales v. United States, 38 F.3d 659, 660 (2d. Cir. 1994) (per curiam), and must be unequivocally expressed rather than implied. See United States v. King, 395 U.S. 1, 4, 23 L. Ed. 2d 52, 89 S. Ct. 1501 (1969). [*6] Plaintiff has the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). Because subject matter jurisdiction speaks to the authority of this Court to hear a claim, I may look at evidence outside of what is alleged in the pleadings to determine whether subject matter jurisdiction exists. Id.

Here, plaintiff sues pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, which waives the United States sovereign immunity as to certain tort claims. The FTCA, however, does not waive the United States' immunity as to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of . . . an employee of the Government whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception to the FTCA's waiver of sovereign immunity bars suit only if two conditions are met: (1) the acts or omission alleged to be negligent involve an "element of judgment or choice" not compelled by statute or regulation; and (2) such judgment [*7] or choice is grounded in "considerations of public policy." United States v. Gaubert, 499 U.S. 315, 322-23, 113 L. Ed. 2d 335, 111 S. Ct. 1267 (1991) (internal citations omitted); Berkovitz v. United States, 486 U.S. 531, 536-37, 100 L. Ed. 2d 531, 108 S. Ct. 1954 (1988). Accordingly, the discretionary function exception precludes claims based on day-to-day management decisions if those decisions require judgment as to which of a range of permissible course is the wisest. Gaubert, 499 U.S. at 325. If a claim falls within the exception, the Court lacks jurisdiction authority to entertain the claim. Fazi v. United States, 935 F.2d 535, 537 (2d Cir. 1991).

For a complaint alleging jurisdiction under the FTCA to survive a motion to dismiss, "it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Gaubert, 499 U.S. at 324-25. The focus of the inquiry is on the "nature of the actions taken and on whether they

2002 U.S. Dist. LEXIS 12621, *

are susceptible to policy analysis" rather than on the decision-maker's subjective [*8] intent. Id. at 325.

Here, plaintiff alleges that FCI Otisville was negligent in (1) permitting Monegro to come into contact with him and not appropriately supervising the cell areas; and (2) allowing Monegro to possess a shaving razor. For the reasons set forth below, these actions are discretionary determinations within the discretionary function exception. I therefore dismiss plaintiff's claims for lack of subject matter jurisdiction.

1. Safeguarding of Inmates

Plaintiff alleges that had the shift officer been inspecting the cell areas at the time of the alleged attack, he would not have been injured. Plaintiff further argues that because he gave information to the Government against his aggressor, Domingo Monegro, that led to Monegro being charged with murder and other crimes, he and Monegro should have been separated.

The internal security of prisons is normally left to the discretion of prison administrators. Rhodes v. Chapman, 452 U.S. 337, 349 n.14, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981). The BOP is charged with the duties of "management and regulation of all Federal penal and correctional institutions" and "providing for the safe-keeping, [*9] care and subsistence of all persons charged with or convicted of offenses." 18 U.S.C. § 4042(a). Although the statute provides the BOP with a duty of care, it addresses only the general responsibilities of BOP employees and does not set forth the particular manner by which the BOP must fulfill this duty. "The absence of specific guidelines of appropriate conduct by BOP officials in administering these duties, therefore, leaves judgment or choice to the BOP officials." Scrima v. Hasty, 1998 U.S. Dist. LEXIS 15050, No. 97 Civ. 8433, 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998).

Federal regulations provide that the BOP shall classify inmates "who present special needs for management" pursuant to the BOP's Central Inmate Management System ("CIM"). 28 C.F.R. § 524.70. Although some inmates will automatically qualify for CIM classification, [2] the regulation provides BOP officials with discretion to determine whether an inmate who has given information concerning the illegal activities of others should be given a separate assignment. See 28 C.F.R. § 524.72(f) (listing some of the factors to consider in classifying individuals [*10] to separate assignments and noting that this assignment includes inmates providing information concerning the activities of others); id. § 524.73(a) ("Except as provided for in paragraphs (a)(1) through (4) . . . , an inmate. . . *may* be classified as a CIM case at any time by a Community Corrections Manager or by appropriate staff at the Central Office, Regional

Office, or institution." (emphasis added)). Neither plaintiff nor his aggressor fell into a category of automatic classification. Other regulations governing the protection of inmates are explicitly discretionary in nature. See 28 C.F.R. § 541.22(a) (setting forth that the warden *may* place an inmate in administrative detention or delegate the authority to do so); 28 C.F.R. § 541.23 (setting out situations that *may* be considered protection cases).

2 The list of required automatic security cases is comprised of: (1) witness security cases; (2) state prisoners; (3) special supervision; and (4) re-committed offenders. See 28 C.F.R. § 524.73(a). Witness security is the only conceivable automatic CIM classification category that petitioner could fall under; but participation in the witness security program is voluntary and requires a commitment interview, admission and orientation before a prisoner is so classified. 28 C.F.R. § 524.73(a)(1). Nothing before us indicates that petitioner was a participant in the program.

[*11] "If a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." Gaubert, 499 U.S. at 324. At FCI Otisville, decisions as to which inmates should be separated and which inmates should be placed in administrative detention or more closely monitored involve a balancing of a number of public policy considerations including the inmate safety, the ability of inmates to move about the facility, general concerns for prison security, and the effective use of limited resources (Menifee Dec. at P 4). Accordingly, I hold that the decision by BOP officials not to put Ortiz in protective custody or separate him from Monegro fell within the discretionary function exception.

2. Inmate Access to Razors

Plaintiff further contends that employees of the BOP were negligent in not taking precautions to prevent injuries from shaving razors. BOP regulations provide that "the Warden shall make available to an inmate those articles necessary for maintaining personal hygiene." 28 C.F.R. § 551.6 [*12] . Like the statutory provisions regarding the safeguarding of inmates, this regulation establishes a duty of care but does not direct the manner in which it is to be fulfilled. The regulation does not offer direction as to what types of hygiene articles are considered "necessary" or the manner in which the warden is to make these items available. Because the regulation leaves implementation decisions to the warden's judgment, the decision to provide inmates with razor blades

meets the first condition of the discretionary function exception.

Moreover, the decision as to whether to make razor blades available to inmates for shaving is, as plaintiff acknowledges in his complaint, a security decision, and implicates many of the same policy considerations as the decisions of how to house and whether to monitor particular inmates, including the inmate safety, general prison security, the interests of inmates and the institution in maintaining good standards of hygiene, and the effective use of limited resources (Menifee Dec. P 7). Therefore, under the discretionary function exception, this Court lacks subject matter jurisdiction over plaintiff's claim.

III. Conclusion

For the foregoing [*13] reasons, the Complaint is dismissed in its entirety. The Clerk of Court is directed to mark this matter as closed.

SO ORDERED.

Dated: New York, New York

July 9, 2002

ALVIN K. HELLERSTEIN

United States District Judge

LEXSEE

**ANN HIBBERT o/b/o SEAN HIBBERT, Plaintiff, -against- KENNETH S. APFEL, Commissioner of Social Security, Defendant.**

**99 Civ. 4246 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2000 U.S. Dist. LEXIS 9791**

**July 14, 2000, Decided
July 17, 2000, Filed**

**DISPOSITION:**  [*1]  Defendant's motion to dismiss pursuant to Rule 41(b) of Federal Rules of Civil Procedure granted.

**COUNSEL:** Ann Hibbert, Plaintiff, Pro se, Poughkeepsie, New York.

For Defendant: Susan D. Baird, Assistant United States Attorney, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

*OPINION AND ORDER*

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Pursuant to the Social Security Act ("Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), plaintiff commenced this action to review a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for child's Supplemental Security Income ("SSI") benefits. Defendant now moves to dismiss for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion is granted.

**I. Legal Standard**

Dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure ("Rule 41(b)") is subject to the discretion of the district courts. *See Nita v. Connecticut Dep't of Envtl. Protection*, 16 F.3d 482, 485 (2d Cir. 1994); *Alvarez v. Simmons Mkt. Research Bureau, Inc.*, 839 F.2d 930, 932 (2d Cir. 1988). [*2]  That discretion, however, should be exercised sparingly and only when the district judge is "sure of the impotence of lesser sanctions." *Chira v. Lockheed Aircraft Corp.*, 634 F.2d 664, 665 (2d Cir. 1980).

**II. Factual Background**

On June 14, 1999, plaintiff filed a Complaint seeking review of the Commissioner's final decision denying her application for SSI benefits. On September 14, 1999, this Court endorsed a Stipulation and Order ("Stipulation"), signed by both parties, extending defendant's time to answer until November 22, 1999. *See* 9/14/99 Order Extending Defendant's Time to Answer. Defendant's Answer was filed on that date.

On December 9, 1999, the United States Attorney's office wrote to plaintiff proposing to remand the action to the Commissioner for further administrative proceedings. *See* 12/9/99 Letter to Plaintiff, Ex. A to 4/5/00 Declaration of Susan D. Baird, Assistant United States Attorney ("Baird Decl."). The letter was mailed to plaintiff at the address listed in the Complaint (13 Academy Street, Apt. 1, Poughkeepsie, New York 12601). *Id.* Plaintiff did not respond. On January 7, 2000, a second letter was sent to the same address. [*3]  *See* Second Letter to Plaintiff, Ex. B to Baird Decl. Again plaintiff did not respond. Neither letter was returned to sender by the Post Office. *See* Baird Decl. PP 5, 7. Also on January 7, the United States Attorney's office made a further attempt to contact plaintiff, this time by telephoning the number listed in the Complaint. *Id.* A recording stated that the number was not a working number. *Id.* On February 11, 2000, the United States Attorney's office again tried to contact plaintiff by telephoning the same number. *See* Baird Decl. P 9. By this time, the number had been reassigned to someone else. *Id.*

On February 15, 2000, this Court issued an order directing plaintiff to appear at a Court conference on March 1, 2000. *See* 2/15/00 Order Directing Plaintiff to Appear at Court Conference. On February 29, 2000, the copy of the Order that had been sent to plaintiff was returned by the post office marked: "Moved, no forwarding address." [1] *See* Baird Decl. P 11. Accordingly, the March 1, 2000 conference was canceled.

> 1  The letter was sent to the address listed in the Complaint, 13 Academy Street. To date, the only address that the Pro Se office has is 13 Academy Street and the Pro Se Office has indicated to this Court that it has received no change of address notifications from plaintiff.

[*4]  On April 6, 2000, defendant moved to dismiss this action for failure to prosecute under Rule 41(b). *See* 4/6/00 Notice of Motion. Finally, on May 9, 2000, this Court issued an Order directing plaintiff to file opposition papers within thirty days and indicating that a failure to comply with the order would result in a decision on defendant's motion based solely on papers submitted by defendant. *See* 5/9/00 Order. The letter was again sent to 13 Academy Street and again returned marked, "Moved, Left No Address." *Id.* Plaintiff has made no attempt to contact Chambers with regard to this motion.

## III. Discussion

A balancing of five factors determines whether a court should grant a Rule 41(b) motion to dismiss for failure to prosecute. *See Jackson v. City of New York*, 22 F.3d 71, 74 (2d Cir. 1994). The district court considers: (1) the duration of the plaintiff's failures; (2) whether plaintiff had received notice that further delays would result in dismissal; (3) whether the defendant is likely to be prejudiced by further delay; (4) whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting [*5]  a party's right to due process and a fair chance to be heard; and (5) whether the judge has adequately assessed the efficacy of lesser sanctions. *See id.*

*First*, plaintiff's failure to take any action since defendant's proposal to remand the case to the Commissioner in December of last year, constitutes an unreasonable delay. Over six months have passed since plaintiff received the proposal. Indeed, courts have held that similar periods of delay justify dismissal of an action. *See, e.g., Chira*, 634 F.2d at 666-67 (plaintiff's failure to take any action to move his case to trial during six months justified dismissal under Rule 41(b)). Moreover, plaintiff has proffered no explanation for her apparent abandonment of her case, nor has she made any attempt to contact this Court or defendant.

*Second*, the Court attempted to notify plaintiff of the potential dismissal of her case via its May 9 Order, which was returned to sender. Regardless of whether plaintiff actually received notice that further delays would result in dismissal, it remained her "duty to process [her] case diligently." *Smith v. Human Resources Admin. of New York City*, 2000 U.S. Dist. LEXIS 5373, 91 Civ. 2295, 2000 WL 307367, [*6]  at *2 (S.D.N.Y. Mar. 24, 2000) (internal quotations and citation omitted) (alteration in original). It is also plaintiff's obligation to inform this Court's Pro Se office of any change of address. Plaintiff's inaccessibility for over six months is anything but diligent prosecution of her case and she has not notified the Pro Se office of any change of address. Even though plaintiff did not receive this Court's Order, defendant may nonetheless prevail on its motion to dismiss for failure to prosecute. *See Mathews v. U.S. Shoe Corp.*, 176 F.R.D. 442, 445 (W.D.N.Y. 1997) (granting defendant's Rule 41(b) motion notwithstanding plaintiff's non-receipt of court's order to comply with discovery requests or be subject to possible dismissal for failure to prosecute).

*Third*, while "prejudice to defendants resulting from an unreasonable delay may be presumed[,] . . . in cases where delay is more moderate or excusable, the need to show actual prejudice is proportionately greater." *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982). Here, however, plaintiff's delay is neither moderate nor excusable. The record is devoid of any explanation for [*7]  plaintiff's complete inaction and failure to respond to numerous attempts to contact her for over six months. Thus, the prejudice to defendant can be fairly presumed.

*Fourth*, dismissing plaintiff's case does not violate her due process rights under the circumstances. Plaintiff has had ample opportunity to prosecute her case and to be heard. Further, both this Court and defendant have made every effort to enable plaintiff to proceed. Plaintiff has nevertheless done nothing. Moreover, as the Second Circuit has explained, "the authority to invoke [dismissal] for failure to prosecute is vital to the efficient administration of judicial affairs and provides meaningful access for other prospective litigants to overcrowded courts." *Id.* at 42. It is not the function of this Court to chase dilatory plaintiffs while other litigants in this district seek access to the courts.

*Fifth*, lesser sanctions are not appropriate in this case. Court Orders and defendant's attempts to contact plaintiff have proven fruitless. Plaintiff has consistently ignored all attempts to contact her, has taken no action in her case for over six months, and has failed to notify any parties [*8]  of any change of address. Plaintiff has apparently lost interest in her case and, accordingly, this

Court is left with no alternative but to dismiss her case for failure to prosecute.

Plaintiff's status as a pro se litigant does not save her case from dismissal. "All litigants, including pro ses [sic.], have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions." *McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 123 (2d Cir. 1988). *See also Lindsey v. Loughlin*, 616 F. Supp. 449, 453 (E.D.N.Y. 1985) (dismissing pro se plaintiff's case under Rule 41(b) because of plaintiff's failure to appear at scheduled conferences, maintain contact with the court, or take other action to prepare case for trial). Plaintiff has no more right to neglect her case while this Court and her adversary spend valuable time trying to find her than does a represented party.

Although sympathetic to the plight of the unrepresented, strong policy concerns further support dismissal. "Delays have dangerous ends, and unless district judges use the clear power to [dismiss] [*9] when appropriate, exhortations of diligence are impotent." *Chira*, 634 F.2d at 668. This Court, and others throughout the country, are flooded daily by litigants seeking redress for harms they have suffered. To permit plaintiff to file an action and then do nothing, thereby completely abdicating her responsibilities, would be to deny other litigants in this district the efficient administration of justice. Under these circumstances, dismissal is appropriate.

**IV. Conclusion**

For the foregoing reasons, I conclude that plaintiff has failed to prosecute her case by making no contact whatsoever with this Court or with defendant for over six months, by failing to respond to all attempts to contact her, and by failing to respond to any of this Court's Orders. Accordingly, defendant's motion to dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure is granted. The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

July 14, 2000

LEXSEE

**CHRISTINA WILSON, as personal representative of the Estate of Jeffrey Wilson, Plaintiff, -against- OXFORD HEALTH PLANS (N.Y.), INC., and OXFORD HEALTH INSURANCE, INC., Defendants, -against- JAS SECURITIES, LLC, Third-Party Defendant.**

**01 Civ. 3417 (MHD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2002 U.S. Dist. LEXIS 14073**

**July 30, 2002, Decided**
**July 31, 2002, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss complaint for failure to prosecute granted.

**COUNSEL:** For Oxford Health Plans (N.Y.), Inc, Oxford Health Insurance, Inc., DEFENDANTS: Peter P McNamara, Rivkin Radler LLP, Uniondale, NY USA.

For Oxford Health Plans (N.Y.), Inc., Oxford Health Insurance, Inc., THIRD-PARTY PLAINTIFFS: Peter P McNamara, Rivkin Radler LLP, Uniondale, NY USA.

For Jas Securities, LLC, THIRD-PARTY DEFENDANT: Michael Present, Sexter & Warmflash, PC, New York, NY USA.

For Jas Securities, LLC, COUNTER-CLAIMANT: Michael Present, Sexter & Warmflash, PC, New York, NY USA.

For Oxford Health Plans (N.Y.), Inc., COUNTER-DEFENDANT: Peter P McNamara, Rivkin Radler LLP, Uniondale, NY USA.

**JUDGES:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** MICHAEL H. DOLINGER

**OPINION**

*MEMORANDUM & ORDER*

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE:

Defendants Oxford Health Plans (N.Y.), Inc. and Oxford Health Insurance, Inc. (collectively "Oxford") have moved to dismiss the complaint for failure to prosecute. Plaintiff, although properly served with the motion, has not responded to it. In view of plaintiff's longstanding non-participation in this lawsuit, the motion to dismiss is [*2] granted. [1]

1    The parties consented to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

This lawsuit was commenced on behalf of Jeffrey Wilson on April 24, 2001 to seek health insurance benefits for him, as he lay critically injured from an automobile accident. At the time of filing, plaintiff moved by order to show cause for a temporary restraining order and preliminary injunctive relief, a motion that he subsequently withdrew. On April 30, 2001, Oxford served a third-party complaint naming JAS Securities, LLC -- Jeffrey Wilson's employer -- as a third-party defendant. On May 21, 2001 Oxford served an answer to the complaint.

Following an initial case management conference on June 1, 2001, the court issued a scheduling order that provided for the completion of discovery by September 14, 2001, and the submission of a joint pre-trial order by October 15, 2001. (Order dated June 6, 2001). The parties subsequently submitted, and the court approved, a case management plan. [*3] (Joint Discovery Plan signed June 18, 2001). Under its terms, fact discovery was to be completed by September 14, 2001, and expert discovery was to end September 29, 2001, with dispositive motions due by October 15, 2001, or, alternatively, a trial-ready date of October 29, 2001.

At the request of the parties, the court approved a modification of this schedule on August 13, 2001. Under the revised order, all discovery was to be completed by October 15, 2001, with a joint pre-trial order due by November 14 and a trial date of November 28, 2001. In the wake of the tragic events of September 11, 2001, this schedule was extended, to permit fact discovery to close on November 9 and expert discovery to end on December 7, 2001. The pretrial order was required to be submitted by December 21, 2001 unless a potentially dispositive motion had been filed by that date. (Order dated Oct. 5, 2001; Amended Order dated Oct. 10, 2001).

By letter dated October 17, 2001, plaintiff's counsel advised the court that Jeffrey Wilson had died the prior week. (Oct. 17, 2001 letter to the court from John H. Chun, Esq.). In light of this development, the parties requested, and the court granted, a thirty-day extension [*4] of all deadlines. (Revised Scheduling Order filed Oct. 18, 2001).

On November 15, 2001, plaintiff's counsel requested a 45-day further extension of all dates, on the basis that settlement discussions were being conducted. (Nov. 13, 2001 letter to the Court from John H. Chun, Esq.). The court granted that request, but provided that no further extensions would be authorized. (Order dated Nov. 13, 2001). As things then stood, all discovery was to end by February 21, 2002, and the parties were to submit a joint pre-trial order by March 7, 2002.

Settlement talks continued slowly, apparently because of delays in obtaining documentation of medical expenses. On January 10, 2002 plaintiff's counsel advised the court that Mrs. Wilson had been appointed by a Florida probate court as her late husband's personal representative, with authority to pursue the litigation on behalf of his estate. (Jan. 10, 2002 letter to the court from John H. Chun, Esq.). The court then granted plaintiff's application to substitute Mrs. Wilson as plaintiff in her capacity as personal representative of her husband's estate. (Order dated Jan. 11, 2002).

With discovery halted for settlement talks, and those negotiations [*5] seemingly lagging, plaintiff's attorney reported on January 31, 2001 that the attorney for Mr. Wilson's estate in the Florida probate proceeding had requested an additional ninety-day stay to await claims of creditors on the estate. He further represented that "Mrs. Wilson is unable at this time to give me authority to proceed with this lawsuit." (Jan. 31, 2002 letter to the court from Robert J. Anello, Esq.). Following a telephone conference, we extended the stay until March 4 and scheduled a status conference at that point. (Endorsed Order dated Feb. 1, 2002).

On February 21, 2002 counsel for plaintiff filed a motion to withdraw. That application was based on plaintiff's refusal, through her probate counsel, to authorize the trial attorneys to proceed further with the litigation and her failure to pay past-due fees. (Declaration of Robert J. Anello, Esq., executed Feb. 21, 2002, at PP 5, 7). Following a telephone conference, the court granted the unopposed motion to withdraw, and directed that plaintiff was "to arrange for the appearance of substitute counsel by no later than April 3, 2002." (Endorsed Order dated March 4, 2002). The order further warned plaintiff that a failure [*6] to obtain counsel could lead to a motion by defendant to dismiss the complaint for failure to prosecute. (*Id.*). [2]

> 2 The premise for this point was the caselaw authority suggesting that a representative plaintiff, such as Mrs. Wilson, may not be permitted to proceed *pro se. See, e.g., Pridgen v. Andresen,* 113 F.3d 391, 393 (2d Cir. 1997).

Plaintiff never arranged for substitute counsel. Indeed, we have heard nothing from her since her first set of attorneys were relieved.

Finally, on June 5, 2002 defendants moved to dismiss for lack of prosecution. The motion lacked a return date, and the court therefore issued a scheduling order requiring that responding papers be served and filed by June 19, 2002 and that reply papers be served by June 26, 2002. The motion papers and the scheduling order were provided not only to Mrs. Wilson, but also to the law firm handling the probate proceeding and the estate's Florida counsel. The only response that we have received to the motion was in the form [*7] of two letters from probate counsel advising that her firm was not authorized to represent the estate in this lawsuit. (June 5 & 10, 2002 letters to the court from Mary-Jo Saeli, Esq.). In short, the motion is unopposed.

*ANALYSIS*

As we have been reminded by our Circuit Court, dismissal for lack of prosecution "is a harsh remedy, not to be utilized without a careful weighing of its appropriateness." *Dodson v. Runyon,* 86 F.3d 37, 39 (2d Cir. 1996) (footnote omitted; citing cases), *cert. denied,* 520 U.S. 1156, 137 L. Ed. 2d 496, 117 S. Ct. 1337 (1997). In assessing the issue, we are required to consider a host of factors that bear on the seriousness of the plaintiff's default and the availability of alternative measures to remedy the situation. As summarized by the appellate court, these considerations include:

> "[1] the duration of the plaintiff's failures, [2] whether plaintiff has received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay,

[4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and [*8] protecting a party's right to due process and a fair chance to be heard, and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.

*Shannon v. General Elec. Co.,* 186 F.3d 186, 193-94 (2d Cir. 1999); *Dodson,* 86 F.3d at 40 (quoting, *inter alia, Alvarez v. Simmons Mkt. Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir. 1988)).

Notwithstanding the substantial caution with which we must assess a motion to dismiss, we conclude that dismissal is amply justified in this case. Plaintiff has failed, over an extended period of time, to participate in any way in her own case, and we have no reason to believe that this stalemate is likely to end in the foreseeable future absent court action.

We start with the listed concerns. The duration of plaintiff's failure to participate in this case has been prolonged. After participating in discovery until the death of her husband and engaging in some limited settlement talks lasting, apparently, into January 2002, she has declined to pay her original lawyers or authorize them to proceed with the lawsuit, she has not opposed their withdrawal and she has thereafter failed [*9] to authorize any other attorney to appear in this case on behalf of her husband's estate, in violation of a specific court directive that also warned her of the potential consequences of refusing to proceed through counsel. Moreover, she has not even sought to oppose defendants' motion to dismiss, thus making clear her refusal to proceed with the litigation.

With regard to possible prejudice to defendants by virtue of further delay, a failure to dismiss would likely leave the case pending for an indefinite time into the future, or at least until plaintiff changed her mind or the court lost patience. Accordingly, we may infer the likelihood of some prejudice if the motion were not granted. *See, e.g., Peart v. City of New York,* 992 F.2d 458, 462 (2d Cir. 1993) ("prejudice resulting from unreasonable delay may be presumed as a matter of law.") (quoting *Lyell Theatre Corp. v. Loews Corp.,* 682 F.2d 37, 43 (2d Cir. 1982)).

As for calendar congestion, this concern is as pressing now as when the Second Circuit first recognized this

consideration as relevant to the dismissal analysis. *See, e.g.,* Deborah Pines, *Civil Backlog Declared 'Distressing' By* [*10] *Newman,* N.Y.L.J., June 17, 1996, at 1; Deborah Pines, *Disposition Rates in Federal Courts Slower,* N.Y.L.J., June 9, 1995, at 1. *See also* Admin. Office of Fed. Courts, *Judicial Business of the United States Courts: 2001 Annual Report of the Director* Table C-5 at 157 (median time from filing to trial in S.D.N.Y. is 22.5 months). Moreover, in its enactment in 1990 of the Civil Justice Reform Act, 28 U.S.C. §§ 471-82, the Congress made plain that promptitude in the completion of pretrial proceedings in civil cases is to be given priority. *See* 28 U.S.C. § 471 (requiring district courts to prepare "civil justice expense and delay reduction plans" in part to "ensure just, speedy, and inexpensive resolutions of civil disputes"). When a plaintiff in effect abandons her case, she directly challenges the accomplishment of that goal. Furthermore, plaintiff's failings in this respect in this case indicates that her due-process right to be heard on her underlying claim is entitled to little weight in our current analysis. *See, e.g., Lukenson v. Harley Cars,* 124 F.R.D. 64, 67 (S.D.N.Y. 1989).

There is also no obvious [*11] alternative to an order of dismissal. Other sanctions against plaintiff are likely to be of no help in moving the case forward. Indeed, we note that, despite representation by very sophisticated counsel in the probate proceeding, she has clearly manifested her intention not to proceed further in this case. Indeed, it is painfully obvious that plaintiff at this stage has no further interest in pursuing this matter.

In sum, the circumstances surrounding plaintiff's current posture plainly constitute what one court has referred to as "a context of facts . . . reflecting a lack of prosecutive intent . . . ." *Beshear v. Weinzapfel,* 474 F.2d 127, 131 (7th Cir. 1973). As such, they justify dismissal.

*CONCLUSION*

For the reasons stated, the defendants' motion to dismiss the complaint for failure to prosecute is granted. The clerk of the Court shall enter judgment accordingly.

**DATED: New York, New York**

**July 30, 2002**

**MICHAEL H. DOLINGER**

    **UNITED STATES MAGISTRATE JUDGE**

LEXSEE

**HO SHIM, Plaintiff, v. JAY BARRY RICHMAN, JOHN RICHMAN, a/k/a JOHN E. RICHMOND, PAUL D'AURIAC a/k/a PAUL DAURIAC, and RUSSELL IAN HENIS, individually and associated in fact under the name VIDEO EXPRESS, d/b/a Video Express, Defendants.**

**90 Civ. 7373 (MGC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1994 U.S. Dist. LEXIS 3737**

**March 29, 1994, Decided**
**March 29, 1994, Filed**

**COUNSEL:** [*1] For Plaintiff: Randy A. Dusek, Esq., New York, NY, By: Randy A. Dusek.For Defendant Jay Barry Richman: Parcher & Hayes, P.C., New York, NY, By: Steven M. Hayes. For Defendants John Richman, Paul D'Auriac & 58th Street Video Inc.: Lynch Rowin Novack Burnbaum & Crystal, P.C., New York, NY, By: Howard C. Crystal. For Defendant Russell Ian Henis: Judah S. Shapiro, Esq., New York, NY, By: Judah S. Shapiro.

**JUDGES:** CEDARBAUM

**OPINION BY:** MIRIAM GOLDMAN CEDARBAUM

**OPINION**

*MEMORANDUM OPINION AND ORDER*

**CEDARBAUM, J.**

Defendants move to dismiss for failure to prosecute under Fed. R. Civ. P. 41(b). For the reasons discussed below, the motions are granted.

This action was filed in late 1990. The complaint alleges various claims including breach of contract, fraud, and conversion arising out of the purchase of two video rental stores. A RICO claim under 18 U.S.C. § 1962 was dismissed on November 12, 1991. On December 23, 1991, plaintiff was granted leave to substitute new counsel. Almost two years later, I directed the parties to appear for a status conference on November 19, 1993. At that conference, I learned that no discovery had taken place and that plaintiff had taken no steps [*2] to prepare his case for trial. Defendants' counsel advised plain-

tiff's counsel that defendants planned to move to dismiss the case for failure to prosecute. Thereafter, plaintiff did nothing to prosecute this action.

On January 19, 1994, defendant Jay Barry Richman served a notice of motion to dismiss for failure to prosecute returnable February 4, 1994. On January 26, 1994, defendants 58th Street Video, Inc., Paul D'Auriac and John Richman filed a similar motion returnable February 11, 1994. To assure that both motions would be heard together, on February 2, 1994, these defendants filed a new notice of motion returnable on February 18, 1994. On February 3, 1993 defendant Russell Ian Henis served a notice of motion also returnable on February 18, 1993.

Plaintiff did not file any papers in opposition to the motions to dismiss for failure to prosecute. By letter dated February 11, 1994 and received in chambers on February 15, 1993, plaintiff's attorney, Randy A. Dusek, requested an adjournment and permission to cross move for partial summary judgment. That request was denied, and counsel for all parties were instructed to appear for oral argument on February 18, 1993. On the return [*3] date, Dusek did not appear, but sent Frederick P. Wiener, an associate who was unfamiliar with the case. I directed Wiener to have Dusek submit an affidavit showing good cause for his client's failure to prosecute this action.

In his belated affidavit, Dusek offers the following as grounds for plaintiff's failure to prosecute: (1) Dusek's difficulty in negotiating a retainer agreement with his client; (2) friction between Dusek and plaintiff's agent in the United States; (3) counsel's difficulty in convincing his client to "withdraw" his RICO claim; (4) the fact that plaintiff was in Korea pursuing other "financial interests;" (5) a language barrier; (6) conclusory allegations

1994 U.S. Dist. LEXIS 3737, *

that defendants obstructed discovery and otherwise delayed the action; (7) an assertion that "the equities do not lie with defendants." None of these excuses is good cause for failure to prosecute.

With respect to Dusek's alleged difficulties with his client, the Supreme Court has held that in civil cases a client cannot avoid the consequences of his lawyer's failure to act. *See Link v. Wabash R. Co.,* 370 U.S. 626, 633-34, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962) [*4] (affirming dismissal of action when lawyer failed to attend a pretrial conference). The fact that plaintiff and his lawyer had difficulty agreeing on a course of action does not insulate plaintiff from the consequences of inaction for more than two years. Furthermore, Dusek misstates the record. There was no need for him to convince his client to "withdraw" his RICO claim; it had already been dismissed by the court before Dusek entered the case.

With respect to the assertion that defendants have delayed the progress of this action by obstructing discovery, courts have regularly held that "plaintiff cannot shift the responsibility of inaction to the defendant. There is no reason why the party being sued should take any steps to subject himself to the expense and inconvenience of a trial, if the plaintiff's neglect could reasonably give the defendant the hope or expectation that the case will never be tried." 5 Moore's Federal Practice, 41-130 (1993).

Plaintiff states that on April 24, 1991, defendants refused to depose one of plaintiff's employees, Tae H. Park. Plaintiff argues that he has been prejudiced because "Mr. Park's testimony was then not preserved for trial, as it should [*5] have been." Dusek Aff. at 6. Plaintiff notes that Park no longer works for him and that Park's whereabouts are currently unknown. But plaintiff has not offered any reason for his own failure to take Park's deposition during the period of his employment if plaintiff wished to preserve Park's testimony for trial. Nor does plaintiff explain why this matter has never before been brought to the attention of the court.

Plaintiff also argues that dismissal is inappropriate because defendants failed to produce documents in response to a demand dated May 24, 1991. This complaint comes too late. Plaintiff did not seek a remedy for any refusal by defendants to provide discovery until after defendants had moved to dismiss for failure to prosecute. Waiting almost three years to complain about discovery problems is not excusable neglect. Finally, plaintiff's vague and conclusory assertion that "the equities do not lie with defendants" is not responsive to defendants' motion.

When ruling on a Rule 41(b) motion a court must consider the record as a whole and evaluate the following factors: (1) the duration of plaintiff's failure; (2) whether plaintiff received notice that further delays would result [*6] in dismissal; (3) whether defendants are likely to be prejudiced by further delay; (4) the balance between the need to alleviate court calendar congestion and protecting a party's right to due process and a fair chance to be heard; and, (5) the efficacy of lesser sanctions. *See Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir. 1988) (discussing factors relevant to appellate review of dismissal). Generally, no one factor is dispositive. *Nita v. Connecticut Dept. of Environmental Protection,* 1994 U.S. App. LEXIS 2181, No. 92-9168 slip op. 1581, 1590 (2d Cir. Feb. 11, 1994).

The first two factors clearly favor dismissal. This action has languished for more than two years. Even after being put on notice at the November 19, 1993 conference that defendants intended to move to dismiss, plaintiff took no steps to prosecute the action.

The third factor counsels against dismissal. None of the affidavits submitted in support of the motions to dismiss cite any particular prejudice that defendants will suffer if the action is allowed to proceed.

The fourth factor favors dismissal. Plaintiff's right to a hearing on the merits of his complaint carries with it an [*7] obligation to ready his claim for trial. Plaintiff took no action whatsoever for more than two years. This failure was explicitly brought to plaintiff's attention on November 19, 1993. Yet, since that conference, plaintiff has not taken any steps to prepare the case for trial.

The fifth factor also favors dismissal. There is no alternative sanction that is appropriate in this case. Plaintiff has provided no evidence of a serious intention to pursue a prompt trial. Half-hearted plaintiffs cannot be permitted to clog the crowded docket of the court.

Accordingly, defendants' motions are granted. This action is dismissed for failure to prosecute.

SO ORDERED.

Dated: New York, New York

March 29, 1994

MIRIAM GOLDMAN CEDARBAUM

United States District Judge

LEXSEE

**DANIEL MYVETT, Plaintiff, -v.- PETER P. ROSATO et al., Defendants.**

**03 Civ. 2379 (LAP) (GWG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 10952**

**June 16, 2004, Decided**

**DISPOSITION:** Magistrate recommended that complaint be dismissed.

**COUNSEL:** [*1] Daniel Myvett, Plaintiff, Pro se, Malone, NY.

For Brian J. Hennessy, Dobbs-Ferry Police Officer, Pat O'Sullivan, Dobbs-Ferry Police Officer, Lewis R. Silverman, Tania M. Torno, Rutherford & Christie, L.L.P., New York, NY.

**JUDGES:** GABRIEL W. GORENSTEIN United States Magistrate Judge.

**OPINION BY:** GABRIEL W. GORENSTEIN

**OPINION**

REPORT AND RECOMMENDATION

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Daniel Myvett, proceeding *pro se*, brought this action under 42 U.S.C. § 1983 for alleged violations of his civil rights stemming from two arrests by the Dobbs Ferry and Greenburgh, New York police departments. Myvett has not taken any steps to prosecute his claims in nearly a year and has not complied with several discovery orders. For the following reasons, Myvett's case should be dismissed for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

I. *BACKGROUND*

Myvett brought this action *pro se* under 42 U.S.C. § 1983 alleging violations of his civil rights stemming from two separate incidents involving the Dobbs Ferry and Greenburgh police departments in which he alleges the police [*2] used excessive force. Amended Com-

plaint, filed June 11, 2003 (Docket # 5) ("Amended Complaint"), PP 1-20. His request to proceed *in forma pauperis* was granted on April 7, 2003. Order, filed April 7, 2003 (Docket # 3), at 2. At the time he filed his original complaint, Myvett gave the Westchester County Jail as his address. *See* Complaint, filed December 30, 2002 (Docket # 2). In his amended complaint filed on June 11, 2003, Myvett listed the Bare Hill Correctional Facility, a New York State prison in Malone, New York, as his address. *See* Amended Complaint.

On December 17, 2003, this Court issued an order pursuant to Fed. R. Civ. P. 16 containing various deadlines for this matter, including a March 12, 2004 deadline for the completion of all discovery. *See* Pre-Trial Order, filed December 17, 2003 (Docket # 14), at 1. The defendants had previously served Myvett, at his state prison address, with a notice of deposition, interrogatories, and documents requests. *See* Notice to Take Deposition upon Oral Examination, filed July 31, 2003 (Docket # 9); Defendants' First Set of Interrogatories and Request for Production of Documents, [*3] dated September 19, 2003.

In February 2004, defendants' counsel wrote to the Court stating that Myvett had failed to respond to their discovery requests. *See* Pre-Trial Order, filed February 17, 2004 (Docket # 15) ("February 17 Order"), at 1. On February 17, 2004, the Court issued an Order instructing Myvett to respond to the discovery requests by March 15, 2004 and warning him that if he failed to do so, "*THIS CASE MAY BE DISMISSED.*" *Id.* (emphasis and capitalization in original). Because the state prison website indicated that Myvett had been paroled on January 15, 2004, the Order instructed defendants' counsel to attempt to locate a parole address for Myvett. *Id.* The Court mailed this Order to Myvett's state prison address but the mailing was returned as undeliverable.

Thereafter, defendants' counsel obtained Myvett's new address from Myvett's parole officer and informed

the Court that, on March 16, 2004, she had forwarded to Myvett at that address a copy of the February 17 Order. *See* Memorandum Endorsement, filed March 23, 2004 (Docket # 16) ("March 23 Mem. End."). Because of the delay in receiving the February 17 Order, the Court gave Myvett until April 7, 2004 to [*4]  comply. *Id.* The Court also ordered Myvett to telephone defendants' counsel to arrange a date for his deposition and warned that his case might be dismissed if he failed to comply with the Order. *Id.*

Myvett did not respond by April 7, 2004 as ordered. Thereafter, defendants' counsel wrote to the Court requesting that the case be dismissed under Fed. R. Civ. P. 37. *See* Memorandum Endorsement, filed April 13, 2004 (Docket # 17) ("April 13 Mem. End."). Rather than issue a sanction at that time, the Court ordered Myvett to write a letter by April 26, 2004 explaining his failure to obey the Court's Orders and again warned Myvett of the possibility of dismissal if he failed to provide a sufficient explanation. *Id.* Myvett failed to respond to this Order as well.

On April 29, 2004, defendants' counsel wrote to the Court requesting that the case be dismissed under Fed. R. Civ. P. 37 or that defendants be permitted to "file a discovery motion seeking: (a) dismissal of the Complaint and/or (b) preclusion at trial of any information or documents requested during discovery." Letter from Tania M. Torno [*5]  to the Court, dated April 29, 2004 ("April 29 Letter"), at 2.

## II. *DISCUSSION*

While the defendants have requested that this case be dismissed under Fed. R. Civ. P. 37, the unavailability of Myvett makes it more appropriate to inquire whether the case should be dismissed for failure to prosecute. Fed. R. Civ. P. 41(b) provides authority to dismiss a case for "failure of the plaintiff to prosecute" upon a defendant's motion. Nonetheless, a court possesses inherent authority to dismiss a case *sua sponte* on this basis. *See, e.g.*, *Link v. Wabash R.R.*, 370 U.S. 626, 629-30, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962); *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2002).

A court should consider the following five factors in deciding whether to dismiss a claim for failure to prosecute:

> "[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike [*6]  the balance between al-

leviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard . . . and [5] whether the judge has adequately assessed the efficacy of lesser sanctions."

*LeSane*, 239 F.3d at 209 (alterations in original) (quoting *Alvarez v. Simmons Mkt. Research Bureau, Inc.*, 839 F.2d 930, 932 (2d Cir. 1988)). No one factor is dispositive, *see Nita v. Conn. Dep't of Envtl. Prot.*, 16 F.3d 482, 485 (2d Cir. 1994), and where the litigant is *pro se* a certain measure of leniency should be afforded, *see Lucas v. Miles*, 84 F.3d 532, 538 (2d Cir. 1996). Dismissal is "a harsh remedy to be utilized only in extreme situations." *LeSane*, 239 F.3d at 209 (internal quotation marks and citation omitted).

Regarding the first factor, there is no set time period of inaction after which a court is authorized to dismiss for failure to prosecute. Myvett last took any step on this case on July 22, 2003, when he filed an affirmation of service of the amended complaint. *See* Affirmation of Service, filed July 22, 2003 (Docket # 8). That nearly a year has [*7]  elapsed since Myvett took any steps to prosecute this case, such as by responding to outstanding discovery requests, strongly counsels in favor of dismissal. *Cf. Chira v. Lockheed Aircraft Corp.*, 634 F.2d 664, 666 (2d Cir. 1980) (dismissal for failure to prosecute after six months of inaction). In addition, after Myvett was paroled on January 15, 2004, he made no attempt to proceed with his case or provide the Pro Se Office of this Court with his new address. This failure also suggests that his case should be dismissed. *See Dong v. United States*, 2004 U.S. Dist. LEXIS 3125, 2004 WL 385117, at *3 (S.D.N.Y. Mar. 2, 2004) (plaintiff's inaccessibility for two months without notifying the Court or the Pro Se Office of a change of address "strongly suggests that he is not diligently pursuing this claim"); *Ortiz v. United States*, 2002 U.S. Dist. LEXIS 12621, 2002 WL 1492115, at *2 (S.D.N.Y. July 11, 2002) (nine months of inactivity by the plaintiff and no knowledge of his whereabouts made it "impossible to proceed with this case"); *see also Hibbert v. Apfel*, 2000 U.S. Dist. LEXIS 9791, 2000 WL 977683, at *2 (S.D.N.Y. July 17, 2000) (*pro se* litigant has the responsibility to update the Court as to his [*8]  or her whereabouts).

The second factor also favors dismissal. This Court gave Myvett numerous warnings that inaction on his part might lead to his case being dismissed. The February 17, 2004 Order contained a specific directive requiring Myvett to respond to the defendants' discovery requests and warned him that his failure to respond could result in dismissal. *See* February 17 Order at 1. In March and April, the Court gave two further warnings to Myvett of

the potential for dismissal if he did not comply with Court directives. *See* March 23 Mem. End.; April 13 Mem. End. It is obvious that Myvett has been given ample notice that his case could be dismissed. This case thus contrasts with those instances where inaction has been attributed solely to the misconduct of the party's attorney and not to the party itself. *See*, *e.g.*, *Dodson v. Runyon*, 86 F.3d 37 (2d Cir. 1996).

The third factor -- whether the defendants will be prejudiced by further delay -- is also met. In order to defend against a claim of injuries and deprivations of civil rights, the defendants naturally would need Myvett's testimony regarding the incidents in question and might need information [*9] from other sources, such as Myvett's doctors. Myvett's failure to participate in this litigation vitiates the possibility of any such efforts. With the further passage of time the difficulty of retrieving accurate information will only increase. Case law recognizes that where a plaintiff has unreasonably delayed in the prosecution of his or her case, prejudice to defendants may be presumed. *See*, *e.g.*, *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982); *Coss v. Sullivan County Jail Adm'r*, 171 F.R.D. 68, 71 (S.D.N.Y. 1997).

The fourth factor concerns striking a balance between alleviating court congestion and respecting Myvett's due process rights. Like all plaintiffs, Myvett deserves a "fair chance to be heard." *LeSane*, 239 F.3d at 209. But Myvett frittered away his "fair chance" by taking no action for nearly a year and specifically ignoring Court directives. It is Myvett's responsibility to move his case toward trial. The Court's docket should not be taken up by cases that are not being actively pursued. *See Ho Shim v. Richman*, 1994 U.S. Dist. LEXIS 3737, 1994 WL 115996, at *3 (S.D.N.Y. Mar. 29, 1994) ("Half-hearted plaintiffs [*10] cannot be permitted to clog the crowded docket of the court.").

The final factor concerns the applicability of lesser sanctions other than dismissal. Here, it would be pointless to issue some lesser sanction when Myvett has not made himself available to comply with a Court Order of any kind.

In light of the above, this case presents one of those "extreme situations" where a dismissal for failure to prosecute is appropriate. Given the presumption in Rule 41(b) that a dismissal "operates as an adjudication on the merits" and the lack of facts mitigating Myvett's conduct, the dismissal should be with prejudice.

*Conclusion*

For the foregoing reasons, this action should be dismissed with prejudice pursuant to Fed. R. Civ. P. 41(b).

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections. *See also* Fed. R. Civ. P. 6(a), (e). [*11] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Loretta A. Preska, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Preska. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn*, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985).

Dated: June 16, 2004

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge